FILED
JOHN P. HEHE
CLERK

2014 JUL 23 PM 4: 12

SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 2:13-CR-183 |
| | : | |
| Plaintiff, | : | JUDGE WATSON |
| | : | |
| v. | : | |
| | : | |
| AMER AHMAD, | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT IN SUPPORT OF EXTRADITION OF AMER AHMAD

I, DOUGLAS W. SQUIRES, being duly sworn, hereby depose and say:

1.     I am a citizen of the United States of America.  I currently reside in the State of Ohio.  I make this affidavit in support of a request to the Government of Pakistan to extradite AMER AHMAD to be sentenced in connection with his conviction in the above-captioned matter.

### BACKGROUND AND EXPERIENCE

2.     I received the degree of Juris Doctor from the University of San Francisco School of Law in 1993.  I am admitted to practice law in the State of California (admitted 1993) and the State of Ohio (admitted 2000).

3.     In 1994, I began working as a Deputy District Attorney for the State of California in Tulare County.  I served in that position until 2000.  As a Deputy District Attorney, I prosecuted major felonies, including murders, rapes, and robberies.  I also served as Interim Supervising District Attorney during that time period.

4.     Since September 1, 2000, I have been employed as an Assistant United States Attorney for the Southern District of Ohio.  In this position, my duties have included the

1

investigation and prosecution of persons charged with violating the criminal laws of the United States.  During my tenure at the United States Attorney's Office, I have participated in the investigation and prosecution of numerous cases involving alleged violations of criminal laws of the United States.  Based upon my training and experience, I am knowledgeable about the criminal laws of the United States and the procedures utilized in the Southern District of Ohio.

5.      In connection with my duties as an Assistant United States Attorney, I have been involved in the prosecution of the criminal case entitled United States of America v. Amer Ahmad. I am familiar with the charges and the evidence in the case and with the contents of the court files in the case.

## PROCEDURAL HISTORY AND CHARGES

6.      Pursuant to the procedural rules for federal courts in the United States, this case was presented to a federal grand jury for indictment, and on August 15, 2013, the Grand Jury returned an Indictment against AMER AHMAD, Mohammed Noure Alo, and Joseph M. Chiavaroli in Case No. 2:13-CR-183 in the United States District Court for the Southern District of Ohio.  It is the practice in the Southern District of Ohio for the Clerk of the United States District Court for the Southern District of Ohio to retain original judicial documents, including Indictments and arrest warrants.  The Clerk of the Court is a judicial officer who is authorized under the laws of the United States to certify as true and accurate, copies of documents maintained by the Clerk.  A certified copy of the Indictment is attached hereto as Exhibit A and incorporated herein by reference.

7.      The Indictment contained eight criminal charges against AMER AHMAD.  These charges included conspiracy, federal program bribery, honest services wire fraud, money laundering, and false statements.  These charges stem from AMER AHMAD's participation in

2

fraudulent and criminal activities that occurred while he served as the Deputy Treasurer for the State of Ohio.

8.      On August 19, 2013, AMER AHMAD was arrested.  He was subsequently released on bond with conditions of pretrial release.   These conditions required AMER AHMAD to notify the court and his counsel in writing before making any change of residence or telephone number, appear in court as required, surrender as directed to serve any sentence imposed, surrender his passport to the Clerk of the Court, and not obtain a passport or other international travel document.  A certified copy of the Order Setting Conditions of Release, which outlines these and other requirements, is attached hereto as Exhibit B and incorporated herein by reference.

9.      On December 23, 2013, AMER AHMAD pleaded guilty, pursuant to an agreement with the United States, to two charges: one charge of conspiracy to commit federal program bribery, honest services wire fraud, and money laundering; and one charge of federal program bribery.   AMER AHMAD pleaded guilty before United States District Judge Michael H. Watson. Entering a guilty plea to charges has the same effect as being convicted of those charges at trial. A certified copy of the Plea Agreement, accompanied by a statement of the facts that form the basis of the charges, is attached hereto as Exhibit C and incorporated herein by reference.   In addition, a certified copy of the minutes from AMER AHMAD's plea hearing is attached hereto as Exhibit D and incorporated herein by reference.

10.      As noted in Exhibit D, after pleading guilty, AMER AHMAD remained released on bond with the same conditions mentioned above.   He was to remain released until his sentencing date, when he would begin serving a term of imprisonment.   On April 24, 2014, he violated his release conditions by not reporting in person as directed by the court.  On April 25, 2014, a warrant was issued for Ahmad's arrest.  A certified copy of the Warrant for Arrest is attached

3

hereto as Exhibit E and incorporated herein by reference.

## STATUTES

11.    The statutes which AMER AHMAD violated, and which form the basis for the United States' request for extradition, are:  Title 18, United States Code, Sections 2, 371, 666(a)(1)(B), 1343, 1346, and 1957.[1]   These statutes and the other statutes referenced later in this affidavit were duly enacted and in force at the time the offenses occurred, at the time the Indictment was filed, and currently are in full force and effect.   True copies of the aforementioned statutes are attached hereto as Exhibits F, G, H, I, J, and K, respectively.

> a.    Title 18, United States Code, Section 2, provides in pertinent part:
>
> > (a)  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> >
> > (b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
>
> b.    Title 18, United States Code, Section 371, provides in pertinent part:
>
> > If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. . . .
>
> c.    Title 18, United States Code, Section 666(a)(1)(B), provides in pertinent

part:

---

[1]  As noted above, AMER AHMAD pleaded guilty to one charge of conspiracy to commit federal program bribery, honest services wire fraud, and money laundering; and one charge of federal program bribery.   Accordingly, AMER AHMAD was convicted of one substantive count of conspiracy, Title 18, United States Code, Section 371; and one substantive count of federal program bribery, Title 18, United States Code, Section 666(a)(1)(B).   The other statutes listed above include aiding and abetting liability and the underlying statutes which AMER AHMAD conspired to violate.   In exchange for AMER AHMAD's guilty plea, the United States had previously agreed to dismiss the remaining six charges against him, and had planned to do so at AMER AHMAD's sentencing.

    (a)   Whoever . . . —

        (1)   being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

            (B)   corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more . . .

shall be fined under this title, imprisoned not more than 10 years, or both. . . .

d.     Title 18, United States Code, Section 1343, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

e.     Title 18, United States Code, Section 1346, provides in pertinent part:

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

f.     Title 18, United States Code, Section 1957, provides in pertinent part:

    (a)   Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

    (b)

        (1)   [T]he punishment for an offense under this section is a fine . . . or imprisonment for not more than ten years or

5

both. . . .

12.     Offenses committed in violation of each of the above-mentioned statutes, are felonies under the laws of the United States and provide for punishment of a period of incarceration.

13.     Title 18, United States Code, Section 3282, a copy of which is attached hereto as Exhibit L, sets forth the statute of limitations which governs prosecutions of the offenses charged in the Indictment and provides in pertinent part:

> [N]o person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is found . . . within five years next after such offense shall have been committed.

Since the Indictment in this case alleged offenses occurring between January 2009 and January 2011, and AMER AHMAD was convicted of those offenses in December 2013, prosecution was not barred by the statute of limitations.   The statute of limitations has no effect after conviction. AMER AHMAD may therefore be sentenced at any point in the future.

14.     AMER AHMAD is an American citizen who is currently in the custody of the Government of Pakistan.

## SUMMARY OF FACTS

15.     The following is a summary of the facts and circumstances, pertinent to this extradition request, which led to the filing of the Indictment and subsequent conviction of AMER AHMAD, the defendant, on the charges discussed above.   Ahmad admitted to his role in the bribery scheme when he pleaded guilty to the charges discussed above.   The plea agreement and statement of facts, adopted by AMER AHMAD, are attached as Exhibit C.

16.     This prosecution arose from an investigation conducted by the Federal Bureau of Investigation (FBI), which revealed that, from about January 2009 to January 2011, AMER

6

AHMAD violated the laws of the United States by accepting bribes in exchange for the award of lucrative brokerage services business to a close friend, Douglas Hampton, and Hampton's company. The investigation also revealed that AMER AHMAD conspired with others to violate these same laws, and that AMER AHMAD aided and abetted others' violations of these same laws.

17.     AMER AHMAD was the Deputy Treasurer for the State of Ohio, a high ranking public office. The Treasurer of the State of Ohio is the state's cash manager and chief investment officer with the duty of managing and collecting public funds. The Office of the Treasurer of the State of Ohio has an Investments Department whose responsibility is to actively manage the state's multi-billion dollar investment portfolios. These portfolios include the State of Ohio Regular account (including the General Revenue Fund), the Ohio Lottery Deferred Prizes Trust Fund, and Star Ohio. The Investments Department staff is responsible for developing strategies designed to maintain target levels of safety, liquidity, and return as directed by the Treasurer's Investment Policy.

18.     The evidence reveals that, from January 2009 to January 2011, Ahmad directed a bribery scheme by which he received more than $500,000 USD from a close friend, Douglas Hampton, in exchange for approving a lucrative contract worth $3.2 million USD for Hampton. The contract awarded 360 trades of state-owned securities to Hampton's firm. The $500,000 USD in bribery payments were laundered in two ways: (a) disguised as "loans" to a company owned by AMER AHMAD and co-defendant Joseph Chiavaroli, and (b) disguised as "legal fees" to another friend of AMER AHMAD, co-defendant Mohammed Noure Alo, an Ohio lawyer.

19.     In total, Douglas Hampton paid AMER AHMAD and his companies $523,622.50 USD, via wire transfers and check. The facts surrounding AMER AHMAD's crimes are laid out

7

in greater detail in the investigator's affidavit, attached hereto as Exhibit M and incorporated herein by reference, and the plea agreement and statement of facts, attached hereto as Exhibit C and incorporated herein by reference.

## IDENTIFICATION AND LOCATION INFORMATION

20.      A photograph of the fugitive is attached and identified at Exhibit N.  AMER AHMAD's physical description is as follows: he is a male, 68 inches tall, weighing 160 pounds, with brown hair and brown eyes.

21.      AMER AHMAD was arrested by the Government of Pakistan after attempting to enter the country with a false passport.   He remains in the custody of the Government of Pakistan.

## EXHIBITS

22.      The following documents and attachments are annexed to this affidavit and are incorporated herein by reference:

1)      certified Indictment (Exhibit A);

2)      certified Order Setting Conditions of Release (Exhibit B);

3)      certified Plea Agreement and Statement of Facts (Exhibit C);

4)      certified minutes from AMER AHMAD's plea hearing (Exhibit D);

5)      Warrant of Arrest for AMER AHMAD (Exhibit E);

6)      true copies of pertinent statutes (Exhibits F through L);

7)      original affidavit of FBI Special Agent Jeffrey D. Rees (Exhibit M);

8)      photograph of AMER AHMAD (Exhibit N).

23.      Each of the affidavits was sworn to before a District Judge of a United States District Court.   Each such District Judge is a duly and legally authorized judicial authority who is authorized to administer an oath for this proceeding.

## APPLICABILITY OF THE EXTRADITION TREATY

24.    The Extradition Treaty between the United States and the United Kingdom, which entered into force on June 25, 1935, and which has effect with respect to Pakistan and the United States (the "Treaty"), provides in Article 1 that Pakistan agrees to extradite a person who is convicted of any crime enumerated in Article 3.    Article 3(22) contains the following extraditable offense: "Bribery, defined to be the offering, giving or receiving of bribes."    AMER AHMAD was convicted of Counts One and Two of the Indictment in Case No. 2:13-CR-183, which charge violations of the criminal laws of the United States that correspond to the category of offenses listed in said Article 3(22).    Extradition is also appropriate under Article 44 of the United Nations Convention Against Corruption (UNCAC), which provides for extradition in cases of bribery and corruption of public officials.

## CONCLUSION

25.    This affidavit, including its exhibits, provides sufficient basis, as required by the Treaty, to support the request of the United States that AMER AHMAD be extradited from Pakistan to the United States, for sentencing in Case No. 2:13-CR-183, and that he be detained by authorities pending the determination of his extradition, and any appeal thereof.


DATED:       Columbus, OH
             United States of America
             July 23        , 2014


                                        DOUGLAS W. SQUIRES
                                        Assistant United States Attorney

9

I hereby certify that this is the original affidavit with all true and correct attachments and that this was sworn to and subscribed to before me by Douglas W. Squires on July 23 _____, 2014, in Columbus, OH, United States of America.

MICHAEL H. WATSON
United States District Court Judge
Southern District of Ohio
United States of America

10

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 2:13 cr 183 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| AMER AHMAD | : | COUNT 1: 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| MOHAMMED NOURE ALO, and | : | |
| | : | COUNT 2: 18 U.S.C. § 666 and 2 |
| JOSEPH M. CHIAVAROLI, | : | (Federal Program Bribery) |
| | : | |
| Defendants | : | COUNT 3: 18 U.S.C. §§ 1343, 1346 and 2 |
| | : | (Honest Services Wire Fraud) |
| | : | |
| | : | COUNTS 4-6: 18 U.S.C. § 1957 and 2 |
| | : | (Money Laundering) |
| | : | |
| | : | COUNT 7: 18 U.S.C. § 1956(h) |
| | : | (Money Laundering Conspiracy) |
| | : | |
| | : | COUNT 8: 18 U.S.C. § 1001 |
| | : | (False Statements) |
| | : | |
| | : | Forfeiture Allegation: 18 U.S.C. |
| | : | § 981(a)(1)(C) and 28 U.S.C. § 2461(c) |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

All dates and times in this Indictment are alleged to be "on or about" the specific date

stated. At all times relevant in this Indictment:

1. The Treasurer of the State of Ohio is the state's cash manager and chief

investment officer with the duty of managing and collecting public funds. The Office of the

Treasurer of the State of Ohio ("TOS") has an Investments Department whose responsibility is to actively manage the state's multi-billion dollar investment portfolios. The Investments Department staff is responsible for developing strategies designed to maintain target levels of safety, liquidity and return as directed by the Treasurer's Investment Policy. The State of Ohio, whose funds are invested by the TOS, receives in excess of $10,000 in federal funding annually.

2.     Defendant AMER AHMAD  was appointed Chief Financial Officer (CFO) of the TOS in 2008. On February 27, 2009, AHMAD was appointed the Deputy Treasurer in addition to continuing his duties as CFO. Additionally, AHMAD was the president of Five Rivers Partners, LLC, a limited liability company owned by AHMAD and his spouse. In or around December of 2009, as a result of an initial investment of $150,000, AHMAD, through Five Rivers Partners, LLC, became a partial owner of an Ohio landscaping business known as Going Green Landscapes and Lawn Care ("GGL"). At all times relevant to this indictment, AHMAD was an Agent of the State of Ohio.

3.     Douglas E. Hampton was a broker and financial advisor operating Hampton Capital Financial Management ("HCM"). AHMAD and his spouse employed Hampton as their financial advisor since 1996. On or about November 18, 2009, AHMAD and his spouse held a financial account with HCM that AHMAD claimed had a then-present market value of $400,000. Hampton and AHMAD attended high school together.

4.     Defendant JOSEPH M. CHIAVAROLI was founder and part-owner of Going Green Landscapes and Lawn Care ("GGL"). On or about November 15, 2009, defendant CHIAVAROLI executed a bill of sale transferring forty-four (44%) ownership of GGL to AHMAD through Five Rivers Partners, LLC in exchange for $150,000.

2

5.     MOHAMMED NOURE ALO is a lawyer and was a partner and founding member of a Columbus-based law firm specializing in immigration law. AHMAD and ALO were close personal friends. On or about November 15, 2009, ALO's law firm was appointed as "attorneys-in-fact to take all appropriate and necessary actions to administer the transfer" of a forty-four (44%) ownership interest from defendant CHIAVAROLI's GGL to defendant AHMAD's Five Rivers Partners, LLC. ALO was the registered agent for Five Rivers Partners, LLC, with the Ohio Secretary of State. On or about February 10, 2010, while AHMAD served the State of Ohio as Deputy Treasurer, ALO became a registered lobbyist to the State of Ohio. ALO had no lobbying experience prior to that date.

### COUNT ONE

(Conspiracy, 18 U.S.C. § 371)

6.     The allegations contained in Paragraphs 1 through 5 of this Indictment are realleged as though fully set forth herein.

7.     From in or around January 2009 and continuing through in or around January 2011, in the Southern District of Ohio and elsewhere, defendants

### AMER AHMAD,
### MOHAMMED NOURE ALO,
### and
### JOSEPH M. CHIAVAROLI

and other persons known and unknown to the Grand Jury, did knowingly conspire and agree with each other to commit offenses against the United States, including federal program bribery, honest services wire fraud, and money laundering, in that:

a.      Defendant AHMAD, as an Agent of the State of Ohio, corruptly solicited, demanded, accepted and agreed to accept money and things of value from Hampton and HCM, intending to be influenced and rewarded in connection any business, transaction and series of transactions of Ohio valued at $5,000 or more, that is payments from Hampton were accepted by AHMAD, ALO, CHIAVAROLI, and companies under their control, in exchange for the award of lucrative brokerage services business to Hampton and HCM in violation of 18 U.S.C. §§ 666 (a)(1)(B) and 2.

b.      Hampton corruptly gave, offered, and promised to give money and other things of value to AHMAD, ALO, CHIAVAROLI, and companies within their control, with the intent to influence AHMAD, an agent of the State of Ohio, in connection with a business transaction and series of transactions valued at $5,000 or more, that is Hampton made payments to AHMAD, ALO, CHIAVAROLI, and companies within their control, including GGL, in return for AHMAD's influencing, in his capacity as Deputy Treasurer, Ohio's award of lucrative brokerage services business to Hampton and HCM in violation of 18 U.S.C. §§ 666 (a)(2) and 2.

c.      Defendants AHMAD, ALO, CHIAVAROLI and Hampton devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the State of Ohio, the government of Ohio, and the Treasury of the State of Ohio of their right to honest services of AHMAD through bribery, kickbacks, and the concealment of material information, and to use the wires, in violation of 18 U.S.C. §§ 1343, 1346 and 2.

d.      Defendant AHMAD, Hampton, and CHIAVAROLI transferred the proceeds of a specified unlawful activity, the proceeds from federal programs bribery in violation of Title 18, United States Code, §§ 666 and 2, and honest services wire fraud in violation of Title

4

18, United States Code, §§ 1343, 1346, and 2 that is, AHMAD, Hampton, and CHIAVAROLI knowingly engaged and caused another to engage in monetary transactions in criminally derived property that was of a value greater than $10,000.00 and was derived from said specified unlawful activity, and that affected interstate and foreign commerce in violation of 18 U.S.C. § 1957 and 2.

## PURPOSE OF THE CONSPIRACY

8.     The purpose of the conspiracy was for defendants AHMAD, ALO. CHIAVAROLI, and Hampton to personally enrich themselves, their friends and associates, and their businesses, by using AHMAD's position in the TOS to secure lucrative state business for Hampton in exchange for payments to AHMAD, ALO, CHIAVAROLI, and companies under their control, and to conceal the conspiracy.

## MANNER AND MEANS

9.     The conspiracy was carried out through the following manner and means:

a.     Defendant AHMAD promised to take and did in fact take official action, including selecting and designating Hampton as an authorized broker to conduct a series of lucrative securities trades on behalf of the State of Ohio and TOS.

b.     Hampton provided defendants AHMAD, ALO, CHIAVAROLI, and GGL, a company within their control, money and other things of value in exchange for AHMAD's official acts, including selecting and designating Hampton as the authorized broker to conduct a series of lucrative securities trades on behalf of TOS.

5

       c.     In his capacity as the TOS's Deputy Treasurer, AHMAD took official acts and used official influence to to ensure that Hampton was included on the list of brokers authorized to conduct securities trades on behalf of the State of Ohio and TOS

       d.     According to a TOS memorandum authored by defendant AHMAD on December 24, 2009, TOS's investment strategy would not involve buying and holding investments, but would rather make "5-10 trades per day" with daily net value assessments. This trading strategy devised by defendant AHMAD in December 2009 generated numerous lucrative opportunities for trades by authorized brokers, such as Hampton.

       e.     After ensuring Hampton's inclusion on the approved broker list for TOS, Hampton received significantly more business from TOS than any other brokers approved to provide brokerage services for TOS investments.

       f.     As a consequence of defendant AHMAD's influence in his capacity of Deputy Treasurer, Hampton's inclusion on TOS's approved broker list resulted in a sharp increase in Hampton and HCM's revenue. The total revenue that Hampton received in commissions as a result of trading on behalf of TOS during the conspiracy amounted to approximately $3,212,877.91.

       g.     In return for defendant AHMAD providing Hampton with TOS's lucrative brokerage services business, Hampton provided a payment in connection with the award of TOS business to ALO, a close personal friend of AHMAD's and the agent for AHMAD's Five Rivers Partners, LLC, disguised as "legal fees," totaling approximately $123,622.50.

       h.     Hampton also made payments to AHMAD totaling approximately $400,000 disguised as "loans" to GGL, a business controlled by AHMAD and CHIAVAROLI.

i.    Defendant AMER AHMAD and Hampton attempted to conceal and did conceal the crimes by, among other things, withholding material facts from the TOS about the nature of their relationship to each other and to ALO.

j.    Defendant AMER AHMAD attempted to conceal and did conceal the crimes by, among other things, withholding material facts from the Ohio Secretary of State and the Ohio Ethics Commission about AHMAD's ownership interest in GGL.

k.    Defendant AMER AHMAD attempted to conceal and did conceal their crimes by, among other things, instructing his subordinates at the TOS's Investment Department to conceal AHMAD's role on internal paperwork concerning trades purportedly conducted by Hampton at AHMAD's direction.

l.    Defendant AMER AHMAD and JOSEPH CHIAVAROLI attempted to conceal and did conceal the crimes by, among other things, deliberately not disclosing to GGL's employees and other investors Hampton's role in infusing money into GGL's bank accounts.

## OVERT ACTS

10.    In furtherance of the conspiracy and to affect the objects thereof, the defendants and or other co-conspirators known and unknown to the Grand Jury committed the following overt acts, among others, in the Southern District of Ohio and elsewhere:

a.    On or about February 3, 2009, Hampton sent an email to defendant AHMAD's email address at the TOS which stated in part: "Let me know about that [RFI] process."

b.    On or before June 1, 2009, Hampton submitted a completed Request for Information (RFI) for Broker/Dealer Services to the TOS where it was reviewed by the selection committee led by defendant AHMAD.

7

    c.  In or around July 2009, following meetings of the Broker/Dealer RFI Committee led by defendant AHMAD, AHMAD recommended to the Treasurer for the State of Ohio that Hampton be selected as an approved broker on behalf of the TOS. On September 9, 2009, AHMAD wrote to Hampton on TOS letterhead, "looking forward to working w/ you @ TOS, a.a."

    d.  On or about October 2, 2009, Hampton conducted his first trade on behalf of TOS as an authorized broker.

    e.  On or about October 8, 2009, defendant ALO transmitted to Hampton via email a fictitious engagement agreement for Hampton's signature purporting to hire ALO for "ALL LOBBYING AND LEGAL NEEDS."

    f.  On or about October 14, 2009, Hampton conducted a series of trades on behalf of the TOS and received total commissions in the amount of $232,289.

    g.  On or about November 10, 2009, Hampton conducted a series of trades on behalf of the TOS from which Hampton received a total commission in the amount of $63,769.

    h.  On or about November 15, 2009, defendant AHMAD and CHIAVAROLI executed a Transfer Agreement in which defendant AHMAD, through Five Rivers Partners, LLC, acquired a forty four percent (44%) ownership interest in GGL from CHIAVAROLI for the agreed upon purchase price of $150,000. Defendant ALO's law firm was appointed by the parties to administer the transfer.

    i.  In return for defendant AHMAD's providing Hampton with TOS's lucrative brokerage services business, AHMAD directed Hampton to provide a payment to defendant ALO, disguised as "legal fees" totaling approximately $123,622.50. Regarding this

8

first payment. AHMAD told Hampton that Hampton would receive a bill from ALO and that Hampton should send the payment to ALO who would in turn route payment to AHMAD.

j.      On or about December 17, 2009, defendant ALO transmitted to Hampton via email a fictitious invoice for $123,622.50 for "Consultation and representation on all legal matters" from "1/6/2009 - 12/17/2009."

k.      On or about December 17, 2009, defendant ALO transmitted to Hampton via email instructions and account information for Hampton to make a wire transfer to the bank account of ALO's law firm in the amount of $123,622.50.

l.      On or about December 18, 2009, defendant ALO transmitted via email additional instructions and a different account number for Hampton to make the wire transfer in the amount of $123,622.50 to ALO's personal account instead of ALO's law firm account.

m.      On or about December 18, 2009, Hampton made a wire transfer from Hampton's business account at RBS Citizen's Bank, in the amount of $123,622.50 to defendant ALO's personal account at JP Morgan Chase.

n.      On or about December 24, 2009, defendant AHMAD drafted a confidential TOS memorandum to the Ohio Treasurer which, among other things, identified Hampton and HCM as among the group of TOS's seven "core" trading partners.

o.      On or about February 9, 2010, Hampton conducted a single trade on behalf of the TOS from which Hampton received a total commission in the amount of $74,769.

On or about the dates listed below, defendant AHMAD and Hampton committed the following overt acts by executing additional trades on behalf of the TOS.

9

| Overt Act | Date | Broker | Par Amount | TOS Trader |
|-----------|------|--------|------------|------------|
| p. | 3/25/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| q. | 3/25/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| r. | 3/29/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| s. | 3/31/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| t. | 3/31/2010 | HAMPTON | 50,000,000.00 | AHMAD |

u.  On or about March 27, 2010, defendant AHMAD added his name to a bank account belonging to GGL as GGL's "Vice President."

v.  On or about March 30, 2010, Hampton wire transferred $100,000 from Hampton's personal account at RBS Citizen's Bank to GGL's business checking account at JP Morgan Chase.

w.  On or about March 30, 2010, defendant AHMAD and CHIAVAROLI used some of the $100,000 wire transfer from Hampton to pay $22,000 to AHMAD's personal credit card.

x.  On or about April 16, 2010, CHIAVAROLI obtained a cashier's check for $25,000 made payable to defendant AHMAD from GGL's funds.

y.  On or about April 19, 2010, CHIAVAROLI deposited $17,097 in cash into his personal bank account.

z.  On or about April 19, 2010, CHIAVAROLI obtained a cashier's check for $9,500 made payable to defendant AHMAD from GGL's funds.

aa.  On or about April 20, 2010, defendant AHMAD deposited the two cashier's checks totaling $34,500 to AHMAD's personal account.

10

bb.    On or about April 30, 2010, defendant AHMAD instructed his
subordinates at the TOS's Investment Department not to memorialize AHMAD's name on any of
TOS's paperwork associated with trades purportedly conducted by Hampton at defendant
AHMAD's direction.

On the below dates, defendant AHMAD and Hampton committed the following overt
acts by executing trades on behalf of the TOS where AHMAD directed his subordinates to record
the name of another trader from TOS in place of AHMAD's name on the TOS paperwork for the
trades.

| Overt Act | Date | Broker | Par Amount | Substitute TOS Trader |
|---|---|---|---|---|
| cc. | 5/6/2010 | HAMPTON | 50,000,000.00 | Trader A |
| dd. | 5/6/2010 | HAMPTON | 50,000,000.00 | Trader A |
| ee. | 8/30/2010 | HAMPTON | 50,000,000.00 | Trader B |
| ff. | 8/30/2010 | HAMPTON | 50,000,000.00 | Trader B |
| gg. | 8/31/2010 | HAMPTON | 50,000,000.00 | Traders A/B |

hh.    On or about August 28, 2010, Hampton issued a $300,000 check to GGL
from Hampton's personal checking account at Charter One Bank.

ii.    On or about August 30, 2010, defendant AHMAD endorsed and deposited
Hampton's $300,000 check into GGL's JP Morgan Chase savings account.

jj.    On or about August 31, 2010, defendant AHMAD used money from the
$300,000 deposit to transfer $10,000 from GGL's savings account to AHMAD's personal
account at JP Morgan Chase.

        kk.     On or about August 31, 2010, CHIAVAROLI used money from the $300,000 deposit to write a $30,000 check to defendant AHMAD drawn on GGL's business checking account.

        ll.     On or about August 31, 2010, defendant AHMAD and CHIAVAROLI used money from the $300,000 deposit to make a $20,350.54 payment on AHMAD's personal credit card.

        mm.     On or about September 27, 2010, almost one month after Hampton sent the $300,000 payment to GGL, Hampton sent a "promissory note" for $300,000 to defendant AHMAD for CHIAVAROLI's signature.

All in violation of Title 18, United States Code, § 371.

## COUNT TWO

(Federal Programs Bribery, 18 U.S.C. § 666 (a)(1)(B) and 2)

11.     The allegations contained in Paragraphs 1 through 10 of this Indictment are realleged as though fully set forth herein.

12.     From in or around January 2009 and continuing through in or around January 2011, in the Southern District of Ohio and elsewhere, defendant

## AMER AHMAD

as an agent of the State of Ohio, aided and abetted by others known and unknown to the grand jury, corruptly solicited, demanded, accepted and agreed to accept money and things of value for the benefit of any person from Hampton and HCM, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of Ohio valued at $5,000 or

12

more, that is payments solicited and accepted by AHMAD, ALO, CHIAVAROLI, and companies under their control in exchange for the award of lucrative brokerage services business to Hampton and HCM.

All in violation of Title 18 U.S.C. §§ 666 (a)(1)(B) and 2.

## COUNT THREE

### (18 U.S.C. § 1343, 1346 and 2)

13.    The allegations contained in Paragraphs 1 through 10 of this Indictment are realleged as though fully set forth herein.

14.    From in or around January 2009 and continuing through in or around January 2011, in the Southern District of Ohio and elsewhere, defendants

**AMER AHMAD
MOHAMMED NOURE ALO
and
JOSEPH M. CHIAVAROLI**

and other persons known and unknown to the Grand Jury, aided and abetted by each other, did devise and intend to device a scheme and artifice to defraud and deprive the State of Ohio and its citizens of their right to the honest services of AHMAD through bribery, kickbacks, and the concealment of material information.

### EXECUTION OF THE SCHEME

15.    On or about the dates listed below, in the Southern District of Ohio and elsewhere. defendants AHMAD and ALO, for the purpose of executing the above-described scheme and artifice to defraud and deprive, and attempting to do so, and aided and abetted by

13

others in its execution, transmitted and caused to be transmitted by means of wire communications in interstate commerce, the following writings, signals, and sounds:

| Date | Interstate Wire Communication |
|---|---|
| December 18, 2010 | $123,622.50 wire transfer from Hampton using HCM's business account (Account No. ****) at RBS Citizen's Bank, headquartered in Providence, RI, to ALO's personal account at JP Morgan Chase, Account No. **** |
| March 30, 2010 | $100,000 wire transfer from Hampton's personal account at RBS Citizen's Bank, headquartered in Providence, RI, to GGL's business checking account at JP Morgan Chase, Account No. **** |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNTS FOUR THROUGH SIX

(Monetary Laundering, 18 U.S.C. § 1957 and 2)

16.    The allegations contained in Paragraphs 1 through 15 of this Indictment are

realleged as though fully set forth herein.

17.    On or about the dates and in the amounts set forth below, the defendant,

## AMER AHMAD
### and
## JOSEPH M. CHIAVAROLI

and other persons known and unknown to the Grand Jury, aided and abetted by each other,

knowingly participated in the transfer of the proceeds of a specified unlawful activity, that is: a

scheme to commit federal program bribery in violation of Title 18, United States Code, § 666,

and honest services wire fraud in violation of Title 18, United States Code, §§ 1343 and 1346,

within the Southern District of Ohio and elsewhere, there and then did knowingly engage and

cause another to engage in the following monetary transactions in criminally derived property

that was of a value greater than $10,000.00 and was derived from said specified unlawful

activity, and that affected interstate and foreign commerce:

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|-------|------|--------|----------------------|
| 4 | March 30, 2010 | $22,000 | Using the $100,000 wire transfer from Hampton's personal account at RBS Citizen's Bank to GGL's business checking account at JP Morgan Chase, Account No. ****, defendant AHMAD and CHIAVAROLI pay $22,000 to AHMAD's personal credit card at JP Morgan Chase on March 30, 2010. |

15

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|-------|------|--------|----------------------|
| 5 | August 31, 2010 | $30,000 | Using the $300,000 deposit from Hampton on August 30, 2010 to GGL's JP Morgan Chase savings account, Account No. ****, defendant AHMAD and CHIAVAROLI make two transfers totaling $188,000 from GGL's savings account to GGL's JP Morgan Chase checking account, Account No. **** and CHIAVAROLI writes a $30,000 check from GGL to defendant AHMAD, which AHMAD deposits into AHMAD's money market savings account, Account No. ****, on August 31, 2010. |
| 6 | August 31, 2010 | $20,350.54 | Using the $300,000 deposit from Hampton to GGL's JP Morgan Chase savings account, Account No. ****, defendant AHMAD and CHIAVAROLI transferred an additional $20,350.54 from the savings account to GGL's JP Morgan Chase checking account, Account No. ****, and then authorized a $20,350.54 Chase Epay payment to defendant AHMAD's personal JP Morgan Chase credit card. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

16

### COUNT SEVEN

(Monetary Laundering Conspiracy, 18 U.S.C. § 1956(h))

18.     The allegations contained in Paragraphs 1 through 17 of this Indictment are realleged as though fully set forth herein.

19.     The allegations contained in Counts Four through Six of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(2)(A).

20.     On or about the dates and in the amounts set forth above, the defendant,

### AMER AHMAD
### and
### JOSEPH M. CHIAVAROLI

and other persons known and unknown to the Grand Jury, did knowingly conspire, confederate, and agree with each and others known and unknown to the grand jury to transfer of the proceeds of a specified unlawful activity, that is: a scheme to commit federal program bribery in violation of Title 18, United States Code, §§ 666 and 2, and to commit honest services wire fraud in violation of Title 18, United States Code, §§ 1343, 1346 and 2, within the Southern District of Ohio, and elsewhere, did there and then did knowingly engage and cause another to engage in monetary transactions in criminally derived property that was of a value greater than $10,000.00 and was derived from said specified unlawful activity, and that affected interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 1956(h).

17

## COUNT EIGHT

(False Statement, 18 U.S.C. § 1001)

21.    The allegations contained in Paragraphs 1 through 20 of this Indictment are realleged as though fully set forth herein.

22.    On or about September 14, 2012, the defendant,

## AMER AHMAD

in the Southern District of Ohio, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States by stating to special agents of the Federal Bureau of Investigation that (a) AHMAD's $150,000 investment in GGL was a loan, (b) that ownership documents reflecting his purchase of GGL were never executed, and (c) that AHMAD never had any management authority over GGL, when, in truth and in fact, as defendant then and there well knew, each of these assertions was false, fictitious, and fraudulent.

In violation of Title 18, United States Code, Section 1001(a)(2).

18

## CRIMINAL FORFEITURE

25.    The allegations contained in Counts One through Eight of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c).

26.    Upon conviction of the offenses in violation of 18 U.S.C. § 666 as set forth in Counts One through Two of this Indictment, and 18 U.S.C. §§ 1343 and 1346 as set forth in Counts One and Three of this Indictment, the defendants, AMER AHMAD, NOURE ALO and JOSEPH M. CHIAVAROLI, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.

27.    If any of the property described above, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

19

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

A TRUE BILL:


s/Foreperson
F O R E P E R S O N



MARK T. D'ALESSANDRO
FIRST ASSISTANT UNITED STATES ATTORNEY


By: _____
BRENDA S. SHOEMAKER
Financial Crimes Chief
Southern District of Ohio


JACK SMITH
Chief
Public Integrity Section
Criminal Division
United States Department of Justice


By: _____
ERIC L. GIBSON
Trial Attorney

I Certify that this is a true
and correct copy of the
original filed in my office
on      8/15/2013
JOHN P. HEHMAN, CLERK

By:

Date:      7/22/2014

# Exhibit B

AO 199A (S.D. Ohio Rev. 6/10)                                                                                                    Page 1 of 6

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

<u>Eastern</u>    Division At   <u>Columbus</u>

**FILED**

TIME _____

AUG 1 9 2013

JOHN P. HEHMAN, Clerk
COLUMBUS, OHIO

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | )   Case No.   2:13-cr-183 (1) |
| <u>Amer Ahmad</u> | ) |
| *Defendant* | ) |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release be subject to the following conditions:

    (1)  The defendant must not violate any federal, state, or local law while on release.

    (2)  The defendant must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.

    (3)  The defendant must immediately advise the court and defense counsel in writing before making any change of residence or telephone number.

    (4)  The defendant must appear in court as required and must surrender as directed to serve any sentence imposed.

The defendant must appear at *(if blank, to be notified)* _____

_____ on _____
                                                                    *Place*

                                                                   *Date and Time*

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released on condition that:

( ✔ )  (5)  The defendant promise to appear in court as required and surrender to serve any sentence imposed.

(   )  (6)  The defendant execute an unsecured bond binding the defendant to pay to the United States the sum of _____ dollars ($ _____ ) in the event of a failure to appear as required or surrender to serve any sentence imposed.

AO 199B/C (S.D. Ohio Rev. 6/10)                                                                                                    Page 2 of 6

## ADDITIONAL CONDITIONS OF RELEASE

Upon finding that release by one of the above methods will not by itself reasonably assure the defendant's appearance and the safety of other persons or the community,

IT IS FURTHER ORDERED that the defendant's release be subject to the conditions marked below:

( ) (7)                              The defendant is placed in the custody of:

Person or organization _____

Address *(only if above is organization)* _____

City and State _____ Tel. No. *(only if above is an organization)* _____

who agrees (a) to supervise the defendant in accordance with all of the conditions of release, (b) to use every effort to assure the defendant's appearance at all scheduled court proceedings, and (c) to notify the court immediately if the defendant violates any condition of release or disappears.

Signed: _____      _____

                                        *Custodian or Proxy*                         *Date*

(✔) (8)   The defendant must:

( ✔ ) (a) submit to supervision and report for supervision to the   Pretrial Services_____ ,
telephone number   614.719.3070_____ , no later than   _____ .

( ) (b) execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property: _____

( ) (c) post with the court the following proof of ownership of the designated property, or the following amount or percentage of the above-described sum  _____ .

( ) (d) execute a bail bond with solvent sureties in the amount of $  _____ .

( ) (e) continue or actively seek employment.

( ) (f) continue or start an education program.

(✔) (g) surrender any passport to:   Clerk of Courts by 4:00 p.m. on August 20, 2013_____

(✔) (h) not obtain a passport or other international travel document.

( ) (i) abide by the following restrictions on personal association, residence, or travel:
reside at an address approved by Pretrial Services

( ) (j) avoid all contact, directly or indirectly, with any person who is or may become a victim or potential witness in the investigation or prosecution, including but not limited to:

(✔) (k) continue medical or psychiatric treatment:  at the direction of Pretrial Services

( ) (l) return to custody each (week) day at  _____ o'clock after being released each (week) day at  _____ o'clock for employment,   schooling, or the following purpose(s):

( ) (m) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

( ) (n) not possess a firearm, destructive device, or other dangerous weapons.

( ) (o) not use alcohol  ( ) at all ( ) excessively.

( ) (p) not use or unlawfully possess a narcotic drug or other controlled substance defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( ) (q) submit to testing for a prohibited substance if required by the pretrial services office or the supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance screening or testing.

Case: 2:13-cr-00183-MHW-TPK Doc #: 55 Filed: 07/23/14 Page: 35 of 88  PAGEID #: 314

AO 199B/C (S.D. Ohio Rev. 6/07)  Case: 2:13-cr-00183-MHW-TPK Doc #: 11 Filed: 08/19/13 Page: 3 of 6  PAGEID #: 56  Page 3 of 6

## ADDITIONAL CONDITIONS OF RELEASE

( ✔ ) (r ) report as soon as possible, to the pretrial services officer or other supervising officer, every
           contact with law enforcement personnel, including arrests, questioning, or traffic stops.

(   ) (s) participate in a program of inpatient or outpatient substance abuse therapy and counseling if
           directed by the pretrial services office or supervising officer.

(   ) (t) participate in one of the following location restriction programs and comply with its
           requirements as directed:

        (   ) (i) **Curfew.** You are restricted to your residence every day (   ) from _____
               to _____ ,or (   ) as directed by pretrial services office or supervising officer; or

        (   ) (ii) **Home Detention.** You are restricted to your residence at all times except for
               employment; education; religious services; medical, substance abuse, or mental
               health treatment; attorney visits; court appearances; court-ordered obligations; or
               other activities pre-approved by the pretrial services office or supervising officer;
               or

        (   ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down except for
               medical necessities and court appearances or other activities specifically approved
               by the court.

(   ) (u) submit to location monitoring as directed by the pretrial services office or supervising officer
           and comply with all of the program requirements and instructions provided, as follows:

        (   ) You must pay all or part of the cost of the program based upon your ability to
              pay as determined by the pretrial services office or supervising officer.

        (   ) (i) Location monitoring technology as directed by the pretrial services office or
              supervising officer;

        (   ) (ii) Radio Frequency (RF) monitoring;

        (   ) (iii) Passive Global Positioning Satellite (GPS) monitoring;

        (   ) (iv) Active Global Positioning Satellite (GPS) monitoring (including "hybrid"
              (Active/Passive) GPS);

        (   ) (v) Voice Recognition monitoring.

(   ) (v) **Computer Monitoring.** Participate in Computer Monitoring with the following conditions
           and abide by its requirements as the pretrial services officer or supervising officers instructs.

        (   ) (i) provide Pretrial Services with accurate information about the defendant's entire
              computer system, hardware/software; all passwords used by the defendant; and the
              defendant's internet service providers.

        (   ) (ii) comply with the requirements of the U.S. Pretrial Services Computer Monitoring
              Program as directed. The defendant will permit the U.S. Pretrial Services Office to
              conduct ongoing monitoring of his/her computer(s), hardware, and software, and
              all electronic devices/ media. The monitoring will include the installation of
              software that allows evaluation of his/her computer use. U.S. Pretrial Services will
              conduct unannounced examinations and/or monitoring of the computer. The cost
              of the monitoring program will be at the defendant's expense unless it is
              determined that the defendant does not have the financial resources.

**Additional Specific Computer Monitoring Conditions**

        (   ) (iii) not possess or have access to any computer or any device with internet capabilities
              (including but not limited to cellular telephones, gaming systems, etc). Further the
              defendant is prohibited from having access to any "on-line" computer service at
              any location, which includes any Internet service provider, bulletin board system,
              or any other public or private network or e-mail system, without prior approval of
              the Court.

AO 199B/C (S.D. Ohio Rev. 6/10)                                                                                      Page 4 of 6

## ADDITIONAL CONDITIONS OF RELEASE

(    )  (iv)  The defendant is prohibited from access to any "on-line" computer services at any
location, including employment or education, without prior approval of the Court.
This includes any Internet Service Provider, bulletin board system or any other
public or private computer network.

(    )  (v)   The defendant is permitted access to the computer and the Internet and will comply
with the Computer Monitoring Program.

(    )  (w) _____

_____

_____

AO 199B/C (S D Ohio Rev. 6/10)                                                                          Page 5 of 6

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court which could result in imprisonment, a fine, or both.

While on release, if you commit a federal offense, you will receive an additional consecutive prison term of not more than ten years if the offense is a felony and not more than a year if the offense is a misdemeanor

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;
(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
*Defendant's Signature*

_____
*Address*

_____
*City and State*

_____
*Telephone Number*

AO 199B/C (S.D. Ohio Rev. 6/10)                                                                                              Page 6 of 6

## Directions to the United States Marshal

( ✔ ) The defendant is ORDERED released after processing.

(    ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release.  If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.


Date:  August 19, 2013                                _____

                                                                  *Judicial Officer's Signature*


                                         **Terence P. Kemp**, *U.S. Magistrate Judge*
                                         *172 Joseph P. Kinneary U.S. Courthouse*
                                                      *85 Marconi Blvd.*
                                                    *Columbus OH 43215*
                                                       *614.719.3410*


I Certify that this is a true
and correct copy of the
original filed in my office
on  8/19/2013
JOHN P. HEHMAN, CLERK
By:
Date:  7/22/2014

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 2:13–CR–183 |
| | : | |
| Plaintiff, | : | JUDGE WATSON |
| | : | |
| v. | : | |
| | : | |
| AMER AHMAD, | : | |
| | : | |
| Defendant. | : | |

### PLEA AGREEMENT

The United States of America, by and through the undersigned attorneys for the Public

Integrity Section, Criminal Division, United States Department of Justice, the United States

Attorney's Office for the Southern District of Ohio (collectively referred to as the "United

States"), AMER AHMAD (hereinafter referred to as the "defendant"), and the defendant's

counsel enter into the following Agreement pursuant to Rule 11 of the Federal Rules of Criminal

Procedure.   The terms of the Agreement are as follows:

1.   **Offense and Maximum Penalties**

The defendant agrees to plead guilty to Counts 1 and 2 of the Indictment filed on August

15, 2013 charging the defendant in Count 1 with conspiracy to commit federal program bribery,

honest services wire fraud, and money laundering, in violation of 18 U.S.C. § 371.   The

maximum penalties for Count 1 is a maximum term of 5 years of imprisonment, a fine of

$250,000, a $100 special assessment, and three years of supervised release.   The maximum

penalties for Count 2 is a is a maximum term of 10 years of imprisonment, a fine of $250,000, a

$100 special assessment, and three years of supervised release   The defendant understands that

any supervised release term is in addition to any prison term the defendant may receive, and that a

violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

### 2.    Factual Basis for the Plea

The defendant will plead guilty because the defendant is in fact guilty of the charged offense. The defendant admits the facts set forth in the statement of facts filed with this Agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The statement of facts, which is hereby incorporated into this Agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(a) of the Sentencing Guidelines.

The defendant understands that the Court intends to question him on the record about the offenses to which he pleads guilty, which questioning will be under oath and which could provide a basis for a later prosecution of this defendant for perjury or false statements if he does not tell the truth.

### 3.    Trial and Assistance and Advice of Counsel

The defendant is satisfied that the defendant's current attorneys have rendered effective assistance. The defendant understands that by entering into this Agreement, defendant surrenders certain rights as provided in this Agreement. The defendant understands that the rights of criminal defendants include the following, among others:

    a.    To be represented by an attorney at every stage of the proceeding, and that, if necessary, one will be appointed to represent him;

    b.    To plead not guilty and to be tried by a jury;

    c.    To be assisted by counsel during such trial;

    d.    To confront and cross-examine adverse witnesses;

    e.    To use compulsory process to summon witnesses for the defense;

f.   Not to be compelled to testify; and

g.   To be presumed innocent throughout trial until and unless found

guilty by a jury.

Defendant understands that if his plea of guilty to the charges set forth in Counts 1 & 2 of

the Indictment are accepted by the Court there will not be a trial of any kind, so that by pleading

guilty to these offenses he waives, or gives up, his right to a trial.

**4.   Role of the Court and the Probation Office**

The defendant understands that the Court has jurisdiction and authority to impose any

sentence within the statutory maximum described above but that the Court will determine the

defendant's actual sentence in accordance with 18 U.S.C. § 3553(a).  The defendant understands

that the Court has not yet determined a sentence and that any estimate of the advisory sentencing

range under the U.S. Sentencing Commission's Sentencing Guidelines Manual the defendant may

have received from the defendant's counsel, the United States, or the Probation Office, is a

prediction, not a promise, and is not binding on the United States, the Probation Office, or the

Court.  Additionally, pursuant to the Supreme Court's decision in <u>United States v. Booker</u>, 125 S.

Ct. 738 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may

impose a sentence above or below the advisory sentencing range, subject only to review by higher

courts for reasonableness.  The United States makes no promise or representation concerning

what sentence the defendant will receive, and the defendant cannot withdraw a guilty plea based

upon the actual sentence.

**5.   Sentencing Guidelines**

In accordance with Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, and in

light of both the offense and of relevant conduct, the United States and the Defendant will

recommend that the Court apply the provisions of the United States Sentencing Guidelines Manual

3

("U.S.S.G.") effective November 1, 2010. The United States and the defendant agree that the defendant has assisted the government in the investigation and prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

The United States and the defendant agree that pursuant to U.S.S.G. § 2B1.1(b)(1)(J), the amount of loss, which cannot be reasonably determined, shall be measured by the gain to the conspirators that resulted from the offenses and is $3,212,877.91, which is more than $2,500,000, but not more than $7,000,000. The base offense level is therefore increased by 18 levels.

The defendant understands that these stipulations and agreements as to guideline factors are not binding on the Probation Office or the Court.

6.     **Waiver of Appeal, FOIA, and Privacy Act Rights**

The defendant also understands that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Nonetheless, the defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximums described above (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatsoever, in exchange for the concessions made by the United States in this Agreement. This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b). The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

4

The defendant understands that he is not a prevailing party as defined in 18 U.S.C. §3006A (statutory note captioned "Attorney Fees and Litigation Expenses to Defense") and hereby expressly waives his rights to sue the United States.

### 7. Special Assessment

The defendant agrees to pay a mandatory special assessment of one hundred dollars ($100.00) for each count of conviction. This payment shall be made to the United States District Court Clerk, 85 Marconi Boulevard, Columbus, Ohio 43215. This assessment shall be paid by defendant before sentence is imposed and defendant will furnish a receipt or other evidence of payment at the time of sentencing.

### 8. Payment of Monetary Penalties and Stipulated Forfeiture

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties and forfeitures are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided for in Section 3613.

Defendant agrees not to contest the forfeiture alleged in the Indictment pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c), and agrees to the entry of a criminal money judgement in the amount of $3.212.877.91 based on the fact that this is the total revenue received in commissions as criminally derived proceeds. The defendant agrees to provide all of his financial information to the United States and the Probation Office and, if requested, to participate in a debtor's examination at any time. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If the defendant is incarcerated, the defendant agrees to

5.

participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

9. **Further Prosecution in this District**

Defendant understands that this Agreement does not protect him from prosecution for perjury, should he testify untruthfully, or for making false statements, nor does it protect him from prosecution for other crimes or offenses which he does not disclose or about which he provides false information, and which the United States discovers by independent investigation. Further, should defendant fail to comply fully with the terms and conditions set forth herein or should he fail to appear as required for sentencing, this Agreement is voidable at the election of the United States, in which case the defendant shall be subject to prosecution as if the Agreement had never been made.

If the Court accepts the defendant's pleas of guilty and the defendant fulfills each of the terms and conditions of this Agreement, the Public Integrity Section, Criminal Division, United States Department of Justice, and the United States Attorney's Office for the Southern District of Ohio agree that it will not further prosecute the defendant for any crimes described in the Indictment or statement of facts.

10. **Waiver of Protections of Proffer Agreements**

To enable the government's proffer of facts it would prove at trial, the defendant now unconditionally waives all protections contained in prior proffer agreements with the government. Defendant agrees that the government may use all statements provided by him, without limitation, in any proceeding brought by the government against the defendant.

**11. Use of Information Provided by the Defendant Under This Agreement**

Pursuant to U.S.S.G. Section 1B1.8, no truthful information that the defendant provides under this Agreement will be used in determining the applicable guideline range, except as provided in Section 2b1.8(b). Nothing in this Agreement, however, restricts the Court's or the Probation Officer's access to information and records in the possession of the United States. Furthermore, nothing in this Agreement prevents the government in any way from prosecuting the defendant should the defendant provide false, untruthful, or perjurious information or testimony, or from using information provided by the defendant in furtherance of any forfeiture action, whether criminal or civil, administrative or judicial.

**12. Breach of the Plea Agreement and Remedies**

This Agreement is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Agreement at the date and time scheduled with the Court by the United States (in consultation with the defendant's attorneys). If the defendant withdraws from this Agreement, or otherwise violates any provision of this Agreement, then:

       a. The United States will be released from its obligations under this Agreement, including any obligation to seek a downward departure or a reduction in sentence. The defendant, however, may not withdraw the guilty plea entered pursuant to this Agreement;

       b. The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this Agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to

7

waive any statute-of-limitations defense; and

    c.    Any prosecution, including the prosecution that is the subject of this

Agreement, may be premised upon any information provided, or

statements made, by the defendant, and all such information, statements,

and leads derived therefrom may be used against the defendant. The

defendant waives any right to claim that statements made before or after

the date of this Agreement, including the statement of facts accompanying

this Agreement or adopted by the defendant and any other statements

made pursuant to this or any other agreement with the United States,

should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim.

P. 11(f), the Sentencing Guidelines or any other provision of the

Constitution or federal law.

Any alleged breach of this Agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of the Agreement by a preponderance of the evidence.

**13.    Nature of the Agreement Modifications and Collateral Consequences**

This written Agreement constitutes the complete plea agreement between the United States, the defendant, and the defendant's counsel. The defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in writing in this Agreement, to cause the defendant to plead guilty. Any modification of this Agreement shall be valid only as set forth in writing in a supplemental or revised Agreement signed by all parties.

Defendant further understands and accepts that in addition to any criminal sanctions,

defendant may be subject to other civil and/or administrative consequences, including, but not limited to, civil liability, and loss of any professional license(s).

Respectfully submitted,

MARK T. D'ALESSANDRO
FIRST ASSISTANT U. S. ATTORNEY

By: _____
DOUGLAS W. SQUIRES
Assistant United States Attorney

JACK SMITH
CHIEF, PUBLIC INTEGRITY

By: _____
ERIC L. GIBSON
Trial Attorney
Public Integrity Section

12/23/2013

Defendant's Signature:    I hereby agree that I have consulted with my attorney and fully

understand all rights with respect to the criminal information.    Further, I fully understand all

rights with respect to 18 U.S.C. § 3553 and the provisions of the Sentencing Guidelines Manual

that may apply in my case.    I have read this Agreement and carefully reviewed every part of it

with my attorney.    I understand this Agreement and voluntarily agree to it.

12-23-13

Date: 12-22-13

AMER AHMAD
Defendant

Defense Counsel Signature:    I am counsel for the defendant in this case.    I have fully

explained to the defendant the defendant's rights with respect to the criminal information.

Further, we have reviewed 18 U.S.C. § 3553 and the Sentencing Guidelines Manual, and I have

fully explained to the defendant the provisions that may apply in this case.    I have carefully

reviewed every part of this Agreement with the defendant.    To my knowledge, the defendant's

decision to enter into this Agreement is an informed and voluntary one.

Date: 12-23-13

KARL. H. SCHNEIDER    0012881
TRINA N. GOETHALS
Attorneys for Defendant
008027N

10

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 2:13-CR-183 |
| | : | |
| Plaintiff, | : | JUDGE WATSON |
| | : | |
| v. | : | |
| | : | |
| AMER AHMAD, | : | |
| | : | |
| Defendant. | : | |

Were this matter to go to trial, the United States of America would prove the following facts beyond a reasonable doubt:

1.    The Treasurer of the State of Ohio is the state's cash manager and chief investment officer with the duty of managing and collecting public funds. The Office of the Treasurer of the State of Ohio ("TOS") has an Investments Department whose responsibility is to actively manage the state's multi-billion dollar investment portfolios. The State of Ohio, whose funds are invested by the TOS, receives in excess of $10,000 in federal funding annually.

2.    AMER AHMAD was appointed Chief Financial Officer (CFO) of the TOS in 2008. On February 27, 2009, AHMAD was appointed the Deputy Treasurer in addition to continuing his duties as CFO. Additionally, AHMAD was the president of Company A, a limited liability company owned by AHMAD and his spouse. In or around December of 2009, as a result of an initial investment of $150,000, AHMAD, through Company A, became a partial owner of an Ohio landscaping business, Company B. At all times relevant to this information, AHMAD was an Agent of the State of Ohio.

3.    DOUGLAS HAMPTON was a broker and financial advisor operating Hampton

-1-

Capital Management ("HCM"). AHMAD and his spouse employed HAMPTON as their financial advisor since 1996. On or about November 18, 2009, AHMAD and his spouse held a financial account with HCM that AHMAD claimed had a then-present market value of $400,000. HAMPTON and AHMAD attended high school together.

     4.    JOSEPH M. CHIAVAROLI was founder and part-owner of Company B. On or about November 15, 2009, CHIAVAROLI executed a bill of sale transferring forty-four (44%) ownership of Company B to AHMAD through Company A in exchange for $150,000.

     5.    Person C is a 2004 graduate of graduate of Ohio State University's Moritz College of Law and was a partner and founding member of a Columbus-based law firm ("Law Firm") specializing in immigration law. AHMAD and Person C were close personal friends. On or about November 15, 2009, Person C's Law Firm was appointed as "attorneys-in-fact to take all appropriate and necessary actions to administer the transfer" of a forty-four (44%) ownership interest from CHIAVAROLI's Company B to AHMAD's Company A. Person C was also the registered agent for Company A, with the Ohio Secretary of State. On or about February 10, 2010, while AHMAD served the State of Ohio as Deputy Treasurer, Person C became a registered lobbyist to the State of Ohio. Person C had no lobbying experience prior to that date.

     6.    From in or around January 2009 and continuing through in or around January 2011, in the Southern District of Ohio and elsewhere, defendant AHMAD did knowingly conspire and agree with HAMPTON, CHIAVAROLI, and Person C to commit offenses constituting federal program bribery, honest services wire fraud, and money laundering through bribes, kickbacks, and the concealment of material information, and to use the wires in furtherance of this scheme.

7.     The purpose of the conspiracy was for defendant AHMAD, HAMPTON, CHIAVAROLI, and Person C to personally enrich themselves, their friends and associates, and their businesses, by using AHMAD's position in the TOS to secure lucrative state business for HAMPTON in exchange for payments to AHMAD, CHIAVAROLI, and Person C and companies under their control, and to conceal the conspiracy.

8.     From in or around January 2009 and continuing through in or around January 2011, HAMPTON made payments to defendant AHMAD, CHIAVAROLI, and Person C, and companies within their control, including Company B, in return for AHMAD's influencing, in his capacity as Deputy Treasurer, Ohio's award of lucrative brokerage services business to HAMPTON.

9.     In his capacity as the TOS's Deputy Treasurer, AHMAD took official acts and used official influence to ensure that HAMPTON was included on the list of brokers authorized to conduct securities trades on behalf of the State of Ohio and TOS

10.     On or about February 3, 2009, defendant HAMPTON sent an email to defendant AHMAD's email address at the TOS which stated in part: "Let me know about that [Request for Information ("RFI")] process."

11.     On or before June 1, 2009, defendant HAMPTON submitted a completed RFI for Broker/Dealer Services to the TOS where it was reviewed by the selection committee led by AHMAD.

12.     Defendant AHMAD and HAMPTON attempted to conceal and did conceal their crimes by, among other things, withholding material facts from the TOS during the RFI process about the nature of their personal and business relationships to each other and to Person C.

-3-

13.     Defendant AHMAD, and others, did take official action, including selecting and designating HAMPTON as the authorized broker to conduct a series of lucrative securities trades on behalf of the State of Ohio and TOS.

14.     In or around July 2009, following meetings of the Broker/Dealer RFI Committee led by defendant AHMAD, AHMAD recommended to the Treasurer for the State of Ohio that HAMPTON be selected as an approved broker on behalf of the TOS. After securing the Treasurer's approval, on September 9, 2009, defendant AHMAD wrote to HAMPTON on TOS letterhead, "looking forward to working w/ you @ TOS, **."

15.     According to a TOS internal memorandum authored by defendant AHMAD on December 24, 2009, TOS's investment strategy would not involve buying and holding investments over the long term, but would rather make "5-10 trades per day" with daily net value assessments. The TOS trading strategy devised by defendant AHMAD generated numerous lucrative opportunities for trades by authorized brokers, such HAMPTON.

16.     After defendant AHMAD ensured that HAMPTON was included on the approved broker list for TOS, defendant AHMAD also directed significantly more business from TOS to HAMPTON than any other brokers approved to provide brokerage services for TOS investments.

17.     As a consequence of defendant AHMAD's influence in his capacity of Deputy Treasurer, HAMPTON's inclusion on TOS's approved broker list resulted in a sharp increase in HAMPTON's and HCM's revenue. The total revenue that HAMPTON received in commissions just as a result of trading on behalf of TOS during the conspiracy amounted to approximately $3,212,877.91.

-4-

18.     On or about October 2, 2009, HAMPTON conducted his first trade on behalf of TOS as an authorized broker.

19.     In or around October of 2009, defendant AHMAD told HAMPTON that he needed to hire Person C as a "lobbyist," and that HAMPTON needed to make payments to Person C in the amount of fifty percent (50%) of the commissions HAMPTON received as a result of trading for TOS.

20.     On or about October 8, 2009, Person C, a close personal friend of defendant AHMAD's and the agent for AHMAD's Company A, transmitted to HAMPTON via email a fictitious engagement agreement for HAMPTON's signature purporting to hire Person C and Law Firm for "ALL LOBBYING AND LEGAL NEEDS."

21.     On or about October 14, 2009, HAMPTON conducted a series of trades on behalf of the TOS and received total commissions in the amount of $232,289.

22.     On or about November 10, 2009, HAMPTON conducted a series of trades on behalf of the TOS from which HAMPTON received a total commission in the amount of $63,769.

23.     On or about November 15, 2009, defendant AHMAD and CHIAVAROLI executed a Transfer Agreement in which AHMAD, through Company A, acquired a forty four percent (44%) ownership interest in Company B from CHIAVAROLI for the agreed upon purchase price of $150,000. Person C's Law Firm was appointed by the parties to administer the transfer.

24.     In return for defendant AHMAD providing HAMPTON with TOS's lucrative brokerage services business, AHMAD directed HAMPTON to provide a payment to Person C,

-5-

disguised as "legal fees" totaling approximately $123,622.50. Regarding this first payment, defendant AHMAD advised HAMPTON that the scheme would work in the following way. Person C would bill HAMPTON for fictitious legal/lobbying fees, HAMPTON would submit payment to Person C, and Person C would, in turn, provide payment to AHMAD.

25.     When HAMPTON inquired of AHMAD how he would receive the payment from Person C, AHMAD explained that Person C would give AHMAD cash, and it would be stored in AHMAD's safe in his home.

26.     On or about December 17, 2009, Person C transmitted to HAMPTON via email a fictitious invoice for $123,622.50 for "Consultation and representation on all legal matters" from "1/6/2009 – 12/17/2009." The invoice from Person C covered the time period of January through December 2009 despite the fact that Person C and HAMPTON only met in October of 2009.

27.     On or about December 17, 2009, Person C transmitted to HAMPTON via email instructions and bank account information for HAMPTON to make a wire transfer to the bank account of Person C's Law Firm, in the amount of $123,622.50.

28.     On or about December 18, 2009, Person C transmitted via email additional instructions and a different account number for HAMPTON to make the wire transfer in the amount of $123,622.50 to Person C's personal account instead of Person C's Law Firm bank account.

29.     On or about December 18, 2009, as directed by defendant AHMAD and Person C, HAMPTON made a wire transfer from HAMPTON's business account at RBS Citizen's Bank, in the amount of $123,622.50 to Person C's personal account at JP Morgan Chase.

30.     On or about December 24, 2009, defendant AHMAD drafted a confidential TOS

-6-

memorandum to the Ohio Treasurer which, among other things, identified HAMPTON and

HCM as among the group of TOS's seven "core" trading partners.

31.     On or about February 9, 2010, HAMPTON conducted a single trade on behalf of

the TOS from which HAMPTON received a total commission in the amount of $74,769.

32.     On or about the dates listed below, defendant AHMAD and HAMPTON executed

additional trades on behalf of the TOS.

| Overt Act | Date | Broker | Par Amount | TOS Trader |
|-----------|------|--------|------------|------------|
| o. | 3/25/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| p. | 3/25/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| q. | 3/29/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| r. | 3/31/2010 | HAMPTON | 50,000,000.00 | AHMAD |
| s. | 3/31/2010 | HAMPTON | 50,000,000.00 | AHMAD |

33.     . On or about March 27, 2010, AHMAD added his name and signature authority to

a bank account belonging to Company B as Company B's "Vice President."

34.     On or about March 30, 2010, HAMPTON wire transferred $100,000 from

HAMPTON's personal account at RBS Citizen's Bank to Company B's business checking

account at JP Morgan Chase.

35.     On or about March 30, 2010, defendant AHMAD and CHIAVAROLI used some

of the $100,000 wire transfer from HAMPTON to pay $22,000 to AHMAD's personal credit

card.

36.     On or about April 16, 2010, CHIAVAROLI obtained a cashier's check for

$25,000 made payable to defendant AHMAD from Company B's funds.

-7-

37.    On or about April 19, 2010, CHIAVAROLI obtained a cashier's check for $9,500 made payable to defendant AHMAD from Company B's funds.

38.    On or about April 20, 2010, AHMAD deposited the two cashier's checks totaling $34,500 to AHMAD's personal account.

39.    During the scheme, defendant AHMAD became concerned about the appearance of the volume of his trading activity with HAMPTON. On or about April 30, 2010, AHMAD instructed his subordinates at the TOS's Investment Department not to memorialize AHMAD's name on any of TOS's internal paperwork associated with trades purportedly conducted by HAMPTON at AHMAD's direction.

40.    Defendant AHMAD attempted to conceal and did conceal the criminal scheme by, among other things, withholding material facts from his 2009 Ohio Ethics Commission Financial Disclosure Statement filed in April of 2010 thereby concealing his association with Company B.

41.    On the below dates, defendant AHMAD and HAMPTON executed trades on behalf of the TOS where AHMAD directed his subordinates to record the name of another trader from TOS in place of AHMAD's name on the TOS paperwork for the trades.

| Overt Act | Date | Broker | Par Amount | Substitute TOS Trader |
|---|---|---|---|---|
| aa. | 5/6/2010 | HAMPTON | 50,000,000.00 | Trader A |
| bb. | 5/6/2010 | HAMPTON | 50,000,000.00 | Trader A |
| cc. | 8/30/2010 | HAMPTON | 50,000,000.00 | Trader B |
| dd. | 8/30/2010 | HAMPTON | 50,000,000.00 | Trader B |
| ee. | 8/31/2010 | HAMPTON | 50,000,000.00 | Traders A/B |

42.     On or about August 28, 2010, HAMPTON issued a $300,000 check to Company B from HAMPTON's personal checking account at Charter One Bank.

43.     On or about August 30, 2010, defendant AHMAD endorsed and deposited defendant HAMPTON's $300,000 check into Company B's JP Morgan Chase savings account.

44.     On or about August 31, 2010, defendant AHMAD used money from the $300,000 deposit to transfer $10,000 from Company B's savings account to AHMAD's personal account at JP Morgan Chase.

45.     On or about August 31, 2010, CHIAVAROLI used money from the $300,000 deposit to write a $30,000 check to defendant AHMAD drawn on Company B's business checking account.

46.     On or about August 31, 2010, defendant AHMAD and CHIAVAROLI used money from the $300,000 deposit to make a $20,350.54 payment on AHMAD's personal credit card.

47.     Defendant AHMAD and CHIAVAROLI attempted to conceal and did conceal their crimes by, among other things, deliberately not disclosing to Company B's employees and other investors HAMPTON's role in infusing money into Company B's bank accounts.

48.     On or about September 27, 2010, to disguise the $300,000 payment to GGL as a "loan," HAMPTON sent a promissory note for $300,000 to defendant AHMAD for CHIAVAROLI's signature. CHIAVAROLI never signed the promissory note.

49.     On or about the dates listed below, in the Southern District of Ohio and elsewhere, defendant AHMAD, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire

-9-

communications in interstate commerce, the following writings, signals, and sounds:

| Date | Interstate Wire Communication |
|------|-------------------------------|
| December 18, 2010 | $123,622.50 wire transfer from HAMPTON using HCM's business account (Account No. ****) at RBS Citizen's Bank, headquartered in Providence, RI, to Person C's personal account at JP Morgan Chase, Account No. **** |
| March 30, 2010 | $100,000 wire transfer from HAMPTON's personal account at RBS Citizen's Bank, headquartered in Providence, RI, to Company B's business checking account at JP Morgan Chase, Account No. **** |

50.     On or about the dates listed below, in the Southern District of Ohio and elsewhere, AHMAD, there and then did knowingly engage and cause another to engage in the following monetary transactions in criminally derived property that was of a value greater than $10,000.00 and was derived from said specified unlawful activity, and that affected interstate and foreign commerce:

| TRANSACTION | DATE | AMOUNT | MONETARY TRANSACTION |
|-------------|------|--------|----------------------|
| 1 | March 30, 2010 | $22,000 | Using the $100,000 wire transfer from HAMPTON's personal account at RBS Citizen's Bank to Company B's business checking account at JP Morgan Chase, Account No. ****, defendant AHMAD and CHIAVAROLI paid $22,000 to AHMAD's personal credit card at JP Morgan Chase on March 30, 2010. |

| TRANSACTION | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 2 | August 31, 2010 | $30,000 | Using the $300,000 deposit from HAMPTON on August 30, 2010 to Company B's JP Morgan Chase savings account, Account No. ****, defendant AHMAD and CHIAVAROLI made two transfers totaling $188,000 from Company B's savings account to Company B's JP Morgan Chase checking account, Account No. **** and CHIAVAROLI wrote a $30,000 check from Company B to AHMAD, which AHMAD deposited into AHMAD's money market savings account, Account No. ****, on August 31, 2010. |
| 3 | August 31, 2010 | $20,350.54 | Using the $300,000 deposit from HAMPTON to Company B's JP Morgan Chase savings account, Account No. ****, defendant AHMAD and CHIAVAROLI transferred an additional $20,350.54 from the savings account to Company B's JP Morgan Chase checking account, Account No. ****, and then authorized a $20,350.54 Chase Epay payment to AHMAD's personal JP Morgan Chase credit card. |

51.     Defendant AHMAD engaged in the conduct described above knowingly, corruptly, and willfully and not because of accident, mistake, or other innocent reason.

52.     This statement of facts includes those facts necessary to support the plea of guilty between defendant AHMAD and the government. It does not include each and every fact known to the defendant or the government, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

-11-

After consulting with my attorneys and pursuant to the plea agreement entered into this day between the defendant, AMER AHMAD, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

12 - 23 - 13

Date: 12 - 22 - 13

AMER AHMAD
Defendant

I am counsel for the defendant in this case. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 12-23-13

KARL H. SCHNEIDER, Esq.          0012881
TRINA N. GOETHALS
Attorney for Amer Ahmad

0081270

I Certify that this is a true and correct copy of the original filed in my office on 12/23/2013

JOHN P. HEHMAN, CLERK

By:

Date:

-12-

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

United States of America,

        Plaintiff,

                                Case No.  2:13cr183(1)

        v.

Amer Ahmad,                            Judge Michael H. Watson

        Defendant.

**CRIMINAL MINUTES before**
**United States District Judge Michael H. Watson**

**Courtroom Deputy:** Jennifer Kacsor
**Court Reporter:** Lahana DuFour
**Date:** December 23, 2013  **Time:** Commenced *2:25* Concluded *3:10* Total *45 mins.*

United States Attorney: Doug Squires    Defendant Attorney:  Karl Schneider

***Court Proceeding:***  Change of Plea - Dft Pleads Guilty to: Count(s) *1 & 2* of Indictment

_✓_ Counsel present.               _____ Waiver of Indictment signed / executed in open court.

_✓_ Deft sworn.

_✓_ Court questions Deft regarding his competency to enter a plea of guilty.

_✓_ Plea Agreement summarized by AUSA _____.

_✓_ SA _____ presents Statement of Facts. Agent Sworn. *Exhibit to Plea Agreement*

_✓_ Court reviews Defendant's rights regarding sentencing under the US Sentencing Commission Guidelines, rights to trial and appeal.

_✓_ Deft pleads guilty

_✓_ Court accepts Deft's Plea

_✓_ PSI ordered by Court.

_✓_ Sentencing set for a future date pursuant to the Court's receipt of the final PSI.

_✓_ Issue of Bond Reviewed.

_✓_ Current Detention Status to remain in effect. *(Bond)*

_____ Additional Comments.

I Certify that this is a true and correct copy of the original filed in my office on 12/23/2013
JOHN P. HEHMAN, CLERK
By: _____
Date: 12/23/2013

Remarks: [ ] Awaiting initial PSI transmittal

# Exhibit E

◆AO 442    (Rev. 10/03)  Warrant for Arrest

# UNITED STATES DISTRICT COURT

District of _____

| | |
|---|---|
| UNITED STATES OF AMERICA | **WARRANT FOR ARREST** |

V.

Amer Ahmad
LKA 5040 South Blackstone Avenue
Chicago IL 60615

Case Number:  2:13-cr-183(1)

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest _____ Amer Ahmad _____

                                                                                    Name

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

☐ Indictment    ☐ Information    ☐ Complaint    ☐ Order of court    ☐ Probation Violation Petition    Supervised Release Violation Petition    **x**  Violation Notice

charging him or her with   (brief description of offense)

## Violating Conditions of Pretrial Release

in violation of Title _____ 18 _____ United States Code, Section(s) _____ 3148(b) _____

Michael H. Watson _____          *Michael H. Watson* (signature)
Name of Issuing Officer                                       Signature of Issuing Officer

District Judge _____                April 25, 2014 - Columbus, Ohio
Title of Issuing Officer                                        Date and Location

| **RETURN** |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

AO 442     (Rev. 12/85) Warrant for Arrest

## THE FOLLOWING IS FURNISHED FOR INFORMATION ONLY:

DEFENDANT'S NAME: _____

ALIAS: _____

LAST KNOWN RESIDENCE: _____

LAST KNOWN EMPLOYMENT: _____

PLACE OF BIRTH: _____

DATE OF BIRTH: _____

SOCIAL SECURITY NUMBER: _____

HEIGHT: _____   WEIGHT: _____

SEX: _____   RACE: _____

HAIR: _____   EYES: _____

SCARS, TATTOOS, OTHER DISTINGUISHING MARKS: _____

_____

_____

FBI NUMBER: _____

COMPLETE DESCRIPTION OF AUTO: _____

_____

INVESTIGATIVE AGENCY AND ADDRESS: _____

_____

_____



I Certify that this is a true
and correct copy of the
original filed in my office
on  4/25/2014
JOHN P. HEHMAN, CLERK
By:
Date:

# Exhibit F

Title 18, United States Code, Section 2, provides in pertinent part:

(a)  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

# Exhibit G

Title 18, United States Code, Section 371, provides in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both…

# Exhibit H

Title 18, United States Code, Section 666(a)(1)(B), provides in pertinent part:

    (a)  Whoever . . . —

        (1)  being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

            (B)  corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more . . .

shall be fined under this title, imprisoned not more than 10 years, or both. . . .

# Exhibit I

Title 18, United States Code, Section 1343, provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises,
> transmits or causes to be transmitted by means of wire, radio, or
> television communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the purpose of
> executing such scheme or artifice, shall be fined under this title or
> imprisoned not more than 20 years, or both…

# Exhibit J

Title 18, United States Code, Section 1346, provides in pertinent part:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

# Exhibit K

Title 18, United States Code, Section 1957, provides in pertinent part:

    (a)    Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

    (b)

        (1)    [T]he punishment for an offense under this section is a fine . . . or imprisonment for not more than ten years or both. . . .

# Exhibit L

Title 18, United States Code, Section 3282, provides in pertinent part:

> [N]o person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is found . . . within five years next after such offense shall have been committed.

# Exhibit M

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 2:13-CR-183 |
| | : | |
| Plaintiff, | : | JUDGE WATSON |
| | : | |
| v. | : | |
| | : | |
| AMER AHMAD, | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT IN SUPPORT OF EXTRADITION OF AMER AHMAD

I, JEFFREY D. REES, being duly sworn, hereby depose and say:

1.     I am a citizen of the United States of America and a resident of the State of Ohio.   I make this affidavit in support of a request to extradite Amer Ahmad to be sentenced in the above-captioned matter.

2.     I am employed by the Federal Bureau of Investigation (FBI) as a Special Agent.   I have been employed by the FBI for 15 years.   Throughout that time, I have personally participated in the investigations of many alleged violations of the criminal laws of the United States.   In particular, I have investigated public corruption crimes such as bribery for the past 14 years. During that time, I have investigated numerous alleged public corruption crimes.

3.     I am responsible for investigating the bribery scheme perpetrated by AMER AHMAD and others between January 2009 and January 2011, which resulted in Douglas Hampton paying AMER AHMAD $523,622.50 USD in bribe payments in exchange for AMER AHMAD approving a lucrative contract worth $3.2 million USD for Hampton.   This bribery is the subject of charges against AMER AHMAD contained in the Indictment, which was returned by a federal grand jury in Columbus, Ohio on August 15, 2013.   AMER AHMAD subsequently pleaded guilty

1

to two counts in the Indictment on December 23, 2013.

4.      The Treasurer of the State of Ohio (TOS) is the state's cash manager and chief investment officer.  TOS has an Investments Department which is responsible for managing the state's multi-billion dollar investment portfolios.

5.      AMER AHMAD was appointed Chief Financial Officer of TOS in 2008, and became Deputy Treasurer on February 27, 2009.  In his capacity as Deputy Treasurer, AMER AHMAD oversaw the process for selecting which brokers would be authorized to conduct securities trades on behalf of TOS.

6.      AMER AHMAD's friend, Douglas Hampton, was a broker and financial advisor operating Hampton Capital Financial Management (HCM) in Canton, Ohio.

7.      Pursuant to the bribery scheme described above, AMER AHMAD and Douglas Hampton agreed that Hampton would pay AMER AHMAD bribe payments in exchange for AMER AHMAD including Douglas Hampton on the list of brokers who could perform securities trades on behalf of TOS.   AMER AHMAD would also direct TOS's business to Hampton.

8.      Pursuant to this agreement, AMER AHMAD received a total of three payments from Hampton totaling $523,622.50 USD.

9.      In order to hide the bribe payments, AMER AHMAD did not accept the money directly.  Instead, he accepted the money through his close friend, co-defendant Mohammed Noure Alo, an Ohio lawyer.  At AMER AHMAD's suggestion, Hampton pretended to hire Alo for consulting services.  Alo did not perform any consulting services for Hampton, as the relationship was merely a ruse for funneling money to AMER AHMAD.  On December 18, 2009, Hampton wired $123,622.50 USD to Alo's personal bank account.

10.      Similarly, for the second payment, AMER AHMAD used a conduit entity to

2

receive the money. He had earlier acquired an ownership interest in Going Green Landscaping and Lawn Care (GGL), a landscaping company. On March 27, 2010, GGL opened a new bank account ending in 4422 at Chase Bank and added AMER AHMAD as a signatory to the account. Three days later, on March 30, 2010, Hampton made a $100,000 USD wire transfer to GGL from his personal account, an RBS Citizen's Bank account ending in 4605. AHMAD spent most of this money on personal expenses, including withdrawing the money by cashier's check, using the money to pay off a personal credit card bill, and using the money to purchase a vehicle.

11. Hampton's third and final payment to AMER AHMAD was made on August 30, 2010. On that date, AMER AHMAD deposited into a GGL Chase bank account ending in 4422 a personal check from Hampton in the amount of $300,000 USD. AMER AHMAD transferred some of this money to a personal bank account, at Chase bank, ending in 3715; issued a check payable to himself; and paid off his personal credit card bill.

12. In exchange for these payments, AMER AHMAD ensured that Douglas Hampton was included on the list of brokers who were authorized to conduct securities trades on behalf of TOS, for which the brokers would receive commissions.

13. AMER AHMAD reviewed Hampton's application to become an authorized broker, and upon AMER AHMAD's recommendation, Hampton was approved to handle securities trades on behalf of TOS. A review of Hampton's application, however, reveals certain shortcomings that should have disqualified Hampton from being approved as a broker for TOS. For example, Hampton had little experience in providing broker-dealer services to the public sector. In his application, Hampton was required to name four clients that were comparable to the State of Ohio. He named just one. This incomplete answer should have disqualified Hampton from consideration, but AMER AHMAD exercised his influence as Deputy Treasurer to approve the

3

application.

14.    After Hampton's application was approved, AMER AHMAD drafted a TOS memorandum concerning the development and implementation of AMER AHMAD's investment strategy for TOS.  The memorandum included Hampton and his company, HCM, in a group of seven core trading partners that TOS would utilize to conduct securities trades.  AMER AHMAD's draft memorandum also stated that TOS's investment strategy would not involve buying and holding investments, but would instead endeavor to conduct five to ten securities trades per day with daily net value assessments.  Accordingly, the TOS trading strategy, as devised by AMER AHMAD, generated lucrative trading opportunities for authorized brokers.

15.    Following Hampton's inclusion on the approved broker list for TOS, Hampton received significantly more business from TOS than any other brokers approved to provide services, including major international trading firms.  Hampton was the approved broker for about 260 trades while AMER AHMAD was still employed at TOS.  On certain occasions, AMER AHMAD would call in a securities trade himself but list Hampton as the broker.  This meant that Hampton would receive a commission on the trade even though he had completed no work on it.

16.    As a consequence of AMER AHMAD including Hampton on the TOS broker list, Hampton and HCM received a sharp increase in revenue.  For the period October 2009 through January 2011, when AMER AHMAD left his position at TOS, Hampton and HCM received $3,212,877 USD in commissions for trades conducted on behalf of TOS.

17.    As noted above, AMER AHMAD pleaded guilty on December 23, 2013, to two counts in the Indictment: conspiracy to commit federal program bribery, honest services wire fraud, and money laundering; and federal program bribery.  As part of his guilty plea, Ahmad

4

signed a plea agreement and statement of facts, in which he admits his role in the bribery scheme. The plea agreement and statement of facts is attached to the prosecutor's affidavit as Exhibit C and incorporated herein by reference.

18.     I have been informed by FBI's Legal Attaché Office in Islamabad, Pakistan, that it has learned through inquiries that AMER AHMAD is being held in Lahore, Pakistan, following his arrest by the Pakistani authorities for attempting to enter Pakistan with a false passport.

19.     A photograph of the fugitive is attached to the prosecutor's affidavit at Exhibit N. This photograph is the person I know to be AMER AHMAD—the person who I have referred to above.   I have conducted interviews of Amer Ahmad in person on three occasions and I have been present at his court proceedings on two occasions, including his guilty plea.   The man in the picture is the same man who appeared in court to plead guilty.


DATED:     Columbus, OH
           United States of America

           _July 23_____, 2014


                          JEFFREY D. REES
                          Special Agent, FBI


     I hereby certify that this is the original affidavit with all true and correct attachments and that this was sworn to and subscribed to before me by Jeffrey D. Rees on _July 23_, 2014, in Columbus, OH, United States of America

                          MICHAEL H. WATSON
                          United States District Court Judge
                          Southern District of Ohio
                          United States of America


5

# Exhibit N

United States Marshals Service
LIMITED OFFICIAL USE
9314892

