## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 2:13-cr-00183** |
| | : | |
| **Plaintiff,** | : | **JUDGE WATSON** |
| | : | |
| **v.** | : | |
| | : | |
| **AMER AHMAD,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
## TO REDUCE HIS SENTENCE DUE TO THE COVID-19 PANDEMIC

Defendant Amer Ahmad has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States opposes the motion. Ahmad will do just about anything to avoid serving his sentence. This Court should deny the motion for several reasons, most importantly, Defendant Ahmad has failed to exhaust his administrative remedies. Should the Court reach the merits, it should deny Ahmad's motion because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

## I.     BACKGROUND OF THE CASE

On December 23, 2013, Defendant Amer Ahmad signed a plea agreement through which he plead guilty on Counts 1 and 2 of his August 2013 indictment. Defendant plead guilty to Conspiracy under 18 U.S.C. § 371 and to Federal Programs Bribery under 18 U.S.C. § 666(A)(1)(b) and 2. As this Court is well-aware, before surrendering to begin his sentence, Ahmad

fled the country and documented his journey evading U.S. authorities in his diary. Ahmad cashed out his family savings, travelled to Mexico and obtained forged documents for his final destination, Pakistan, where he was arrested and charged. Defendant was eventually extradited from Pakistan (one of a handful of Americans extradited from that country) and was returned by the United States Marshal Service to the United States after 16 months. Upon return, this Court sentenced him to 180 months of imprisonment. Defendant has served just 88 months of that sentence. Defendant claims to have made a request for compassionate release to the warden on April 25, 2020.  He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP), relying on the threat posed by the COVID-19 pandemic. Because: (a) he has served a scant portion of a lengthy sentence for a massive public corruption scheme he mastermind and from which he profited, (b) the BOP has a robust and healthy plan in place to protect prisoners like Ahmad, (c) he has neither sought the benefit of BOP administrative review of his circumstances nor requested relief from BOP, and (d) he has failed his burden to provide documented medical evidence of the conditions he claims. For these reasons, and more, his motion should be denied.

### A.  Bureau Of Prison's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons (BOP) has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

The BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for

medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel has been cancelled. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who is approved for access will be screened for symptoms and risk factors before entering the facility.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. The BOP has increased detainees' telephone allowance to 500 minutes per month in order to ensure that familial relationships are maintained throughout this disruption. Tours of facilities are also suspended. Legal visits may be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement. Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Exhibit A (Mem. for Director of Bureau of Prisons). As of this filing, BOP has transferred 6,997 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/ (Last Updated July 20, 2020).

Taken together, all of these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and

to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

### B. Defendant's Serious Conviction for Public Corruption and Flight

In total, by his own admission, Defendant accepted over $500,000 in bribe payments from co-conspirator Douglas Hampton steering millions of dollar of State business to his co-conspirator. Over the course of two years, Defendant used his position as Deputy Treasurer to received substantial personal gain. In exchange for money, Defendant disregarded his duty to serve as a public steward for the State of Ohio's funds in exchange for compensation and in doing so undermined the fair administration of Ohio's government. For these egregious actions Defendant has been convicted of Conspiracy under 18 U.S.C. § 371 (Count 1) and to Federal Programs

Bribery under 18 U.S.C. § 666(A)(1)(b) and 2 (Count 2). Defendant was sentenced to 60 months for Count 1 and 120 months for Count 2. Aside from these convictions, Defendant's record reflects a protection order obtained against him by his wife to protect herself and their children and criminal charges in Lahore, Pakistan for presenting false travel documents related to his flight in 2014.

### C. Ahmad's Request for a Sentence Reduction Is Without Support

Since The First Step Act has amended 18 U.S.C. § 3582(c)(1)(A), inmates, rather than the BOP, are able to file a motion for compassionate release once the BOP declines the request to file or 30 days has passed since the inmate's request for compassionate release has been provided to the warden. Defendant moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Defendant appears to have satisfied the administrative exhaustion requirement. On April 25, 2020, Defendant allegedly submitted a request for compassionate release to the warden of the facility where he is imprisoned. Mot. for Compassionate Release, Exhibit C, United States v. Ahmad, No. 2:13-cr-00183 (U.S. Dist. Ct. S.D. Ohio, Eastern Div.). Defendant allegedly submitted the request. However, FCI Terminal Island has no record of a request made by Defendant. Additionally, Defendant's alleged request merely mentioned COVID-19 and provided no information regarding his health conditions. Defendant's failure to provide the BOP with the same amount of information as his motion to this court in order to resolve the issue indicates Defendant's failure to exhaust administrative options.

Defendant has filed no prior motions for release or reduction of sentence prior to the motion at issue. Defendant has served 88 months of the 180 months he has been sentenced for his crimes, approximately 48% of his sentence. In his Motion for Compassionate Release, Defendant claims to have developed two medical issues while incarcerated (hypertension and diabetes) but has failed to provide any documentation of these new medical issues.

There have been cases of COVID-19 at Terminal Island FCI and Terminal Island has made alterations to their facility and policies to hinder the spread of COVID-19 in order to keep inmates as safe as possible.

Ahmad makes no mention in his motion regarding his BOP case manager, the person best positioned to assess Ahmad's risk, probably because BOP has no record of receiving a request for a reduction in sentence or compassionate release from Defendant.

On July 9, 2020, Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his health problems makes him particularly vulnerable to becoming seriously ill from COVID-19.

## II.    LEGAL ARGUMENT

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that the BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing

Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13. The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

### A. Ahmad's Request for Release Fails for Several Reasons

First, the BOP's procedure is the most appropriate forum for assessing the decision and the BOP should be provided the ability to receive all compelling information regarding Defendant's release. Second, Defendant has not legitimately exhausted his administrative remedies by which to achieve a sentence reduction. Lastly, Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction nor has Defendant established that relevant § 3553(a) factors weigh in favor of his release.

### 1. The BOP is in the Best Position to Assess Risk to Ahmad

On March 13, 2020, in accordance with its Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmission into and inside its facilities. BOP's detailed action plan and current phase are function as to minimize the spread of

COVID-19. The BOP, now exercising the authority directed by the Attorney General to increase home confinements, has created an organized manner of evaluating inmates for home confinement. In assessing whether home confinement is appropriate for a particular inmate, BOP weighs numerous factors, including the inmate's: medical conditions, age, crime of conviction, conduct while in prison; conditions in the inmate's particular institution; availability of post-release transportation, housing, and supervision for the inmate; and the inmate's risk from COVID-19 if released. Prior to releasing an inmate, the BOP is directed to implement a fourteen-day quarantine in order to protect the community.

The BOP is devoting all available resources to executing the Attorney General's directives, and is systematically assessing the inmate population to determine which inmates are most appropriate for transfer. Since the Attorney General's memo on March 26, 2020, BOP has placed an additional 6,997 inmates on home confinement. *See* www.BOP.gov/coronavirus (last accessed July 20, 2020). BOP's home confinement program provides a centralized, consistent mechanism for identifying prisoners for whom home confinement is most appropriate. The resulting reduction in prison population will in turn benefit all remaining prisoners. Courts should hesitate to disrupt this systematic effort by granting compassionate release to prisoners who may be less deserving than others nationally, and without the capacity to conduct the comprehensive and consistent review that can be undertaken by BOP.

## 2. This Court Should Deny the Motion Because Defendant Has Not Exhausted Administrative Remedies

This Court lacks authority to act on Defendant's motion for a sentence reduction at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted

all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory, and it continues to serve an important function during the present crisis. The government is very mindful of the concerns created by COVID-19, and BOP is making its best effort to both protect the inmate population and address the unique circumstances of individual inmates. This Court ought to deny the motion without prejudice because, while Defendant claims to have submitted a request, FCI Terminal Island has no record of a request from Defendant and if that request was properly submitted, the request makes a materially different claim than the claim Defendant made in his Motion for Compassionate Release.

Section 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). The requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

Additionally, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the

extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

While Defendant asserts that he made a request on April 25, 2020, FCI Terminal Island has no record of receiving a request for compassionate release from Defendant. Additionally, Defendant is incorrect that the alleged administrative request he made in April of 2020, that did not address Defendant's health conditions creating an increased risk if exposed to COVID-19, somehow suffices. As one court correctly explained:

> One of the purposes for requiring prisoners to exhaust their administrative remedies before bringing a claim in federal court is to give the BOP an opportunity to address the issue. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). To properly exhaust administrative remedies, therefore, the administrative complaint must raise the same claims asserted in the federal court filing. *See Gadra-Lord v. Doe*, 736 F. App'x 30, 32 (3d Cir. 2018) (prisoner failed to exhaust administrative remedies even though he filed numerous prison grievances because none addressed the subject of the federal court complaint).

*United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020); *see also United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020). The Court does not consider administrative exhaustion of a request for compassionate release to then meet the requirement for subsequent requests that are based on different arguments and evidence. *United States v. Mogavero*, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020). "Simply put, the Court cannot consider a motion for compassionate release that is based on evidence or arguments that weren't presented to the Bureau of Prisons first." *Id.* Instead, "[p]roper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden." *Id.*

28 C.F.R. § 571.61, which outlines the process for submitting a § 3582(c)(1)(A) states that request to the warden contain, 'at a minimum . . . [t]he extraordinary or compelling circumstances that the inmate believes warrant consideration.' *Id*. Mogavero's motion for release is based on cancer and its relative COVID-19 exposure risks but the new factor of COVID-19 was not presented to the warden. *Id*. Mogavero has thus failed to properly exhaust the administrative process with the warden before submitting this motion, and this deficiency alone justifies denying her motion.". *Id*.

In *United States v. Dougherty*, Dougherty submit a request to their warden for compassionate release. *United States v. Dougherty*, No. 2:18-cr-229-2, 2020 WL 1909964 at *1 (S.D. Ohio). However, Dougherty's request to the warden had a materially different rationale for why compassionate release should be granted. *Id*. This Court decided that Dougherty failed to exhaust her administrative remedies by not making the same claim to the warden as she did to the courts. *Id*. While Defendant claims to have submitted a request to the warden and not receive a response within 30 days, the request that he allegedly submitted to the warden, permitting the filing of his motion, was materially different and therefore justifies denial of his motion.

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Its assessment will always be of value to the parties and the Court. However, the BOP needs the opportunity to conduct such a review by

not only having the request actually submitted but by also having the same material rational as to why compassionate release is appropriate.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to release an inmate to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. However, the BOP needs the proper information from the inmate in order to make such decisions. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. Accordingly, Defendant's motion should be denied without prejudice to refiling once he has exhausted administrative remedies.

3. **Should the Court Reach the Merits, Ahmad Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and the § 3553(A) Factors Strongly Weigh Against His Release**

Defendant's motion for a reduction of his sentence should be denied for two reasons. First, Defendant has not demonstrated "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, the § 3553(A) statutory sentencing factors do not weigh in favor of Defendant's release.

### a. Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied. The mere existence of the COVID-19 pandemic, which poses a general threat to every person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently

justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020);; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). Also instructive is the recent case in *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic. Therefore, Defendant would have to prove the existence of specific medical conditions that greatly exacerbate his specific risk associated with COVID-19 so as to be considered extraordinary and compelling reasons.

First, Defendant has not provided sufficient documentation for his asserted medical conditions and therefore cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone. Defendant failed to provide any medical records to verify medical conditions his motion claims constitute extraordinary and compelling reasons. The United States took

initiative to obtain said medical records despite the burden of proof laying with the party filing the motion.

Second, Defendant has not identified a verified medical condition that falls within one of the categories specified in the policy statement's application note. Defendant claims to have the four medical conditions of asthma, obesity, hypertension, and diabetes that contribute in creating extraordinary and compelling reasons for compassionate release.

Defendant's verified conditions do not rise to the level of severity required under the policy statement. Defendant has asserted that he suffers from asthma. Mot. for Compassionate Release, 6, United States v. Ahmad, No. 2:13-cr-00183 (U.S. Dist. Ct. S.D. Ohio, Eastern Div.). Defendant, however, fails to specify the extent of his asthma. *United States v. Howell* concluded that because the CDC has identified only moderate to severe asthma, rather than all asthmas, as a condition that increases the likelihood of serious illness from COVID-19, Howell's failure to specify the extent of his condition was therefore fatal to his motion. *United States v. Howell*, No. 3:17-cr-151 (SRU) 2020 WL 2475640 at *3 (D. Conn). Additionally, Howell's medical history indicated seasonal issues with asthma which the Court then concluded suggests mild asthma. *Id*. Defendant provided no medical records to verify his medical history but there is a history of asthma documented in Defendant's Presentence Investigation Report and the BOP records obtained by the United States verify a history of asthma. (Presentence Investigation Report at 18).

Defendant's PIR details that Defendant's use of his inhaler is "more frequent[ly] during the allergy season". (Presentence Investigation Report at 18). Defendant's asthma flare ups occurring seasonally are, like in *Howell*, suggestive of mild asthma and thus does not rise to the level of severity required under the policy. Additionally, Defendant's asthma being well maintained through the use of an Albuterol inhaler also indicates a likelihood of mild asthma. With

the CDC identifying that only moderate to severe asthma is considered as an increased risk health condition, and as it is clearly demonstrated in *Howell* that Defendant's seasonally impacted asthma is not the type of health condition considered persuasive in motions for compassionate release. Therefore, the Court should refrain from considering Defendant's history of asthma in determining the presence of extraordinary and compelling reasons.

Defendant additionally claims that suffering from hypertension contributes to his health conditions which create such significant risk that it is an extraordinary and compelling reason for compassionate release. Defendant failed to meet his burden of proof in showing to the court that he has hypertension. However, the United States accessed Defendant's medical records and confirmed that Defendant does in fact suffer from hypertension.

The CDC has concluded that individuals with hypertension "might" be at an increased risk for severe illness from COVID-19". *See*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Though Defendant suffers from hypertension the risk created by hypertension is neither extraordinary nor compelling due to the frequency with which it takes place. Approximately one half of American adults have hypertension. See, https://www.cdc.gov/bloodpressure/facts.htm. If all inmates who have hypertension were considered to have extraordinary and compelling reasons, a far too expansive release standard would be created resulting in a hazard to the public.

In *United States v. Grey*, a 61-year-old inmate with atrial fibrillation, hypertension, and osteoarthritis in both knees was found to not have medical conditions that met the standard of extraordinary and compelling reasons. *United States v. Grey*, No. 1:04-CR-00580, 2020 WL

4564735 (N.D. Ohio). While hypertension can be dangerous, there is no evidence that Defendant's hypertension significantly increases his risk related to COVID-19 and there is no evidence that his condition is not being properly managed within the facility. Because hypertension is not a confirmed high risk category by the CDC and because Defendant's hypertension is apparently well-managed at the facility, this Court should refrain from considering Defendant's condition of hypertension when determining extraordinary and compelling reason. Should the court take this medical condition into account, the Court should bear in mind the limited weight that other courts have afforded hypertension as an extraordinary and compelling reason.

Defendant additionally cites the increased risk of severe illness associated with obesity as one of his extraordinary and compelling reasons for compassionate release despite the fact that Defendant is not obese. Obesity is defined by a BMI of 30 or greater. *See*, https://www.cdc.gov/obesity/adult/defining.html. With Defendant's BMI being 26.6, Defendant is considered "overweight" but not "obese". *Id*. Not only is Defendant not obese, Defendant's BMI is drastically closer to the category of "normal", where the cutoff is a BMI of 25. *Id*. In fact, the Average BMI of American men is 26.6, precisely Defendant's BMI. *See*, https://www.cdc.gov/nchs/data/nhanes/databriefs/adultweight.pdf. Because Defendant's BMI is not representative of obesity, the Court should refrain from considering Defendant's claim of obesity in determining if extraordinary and compelling reasons are present as so to make compassionate release appropriate.

Additionally, this court should not consider Defendant's claim of diabetes because he does not meet his burden of providing evidence to support his claims, and to the contrary, his claim is unsupported by BOP medical records. Those medical records are voluminous and available to the Court upon request. Those records show defendant has not been diagnosed with diabetes nor does

Defendant's A1C rise to the category of "pre-diabetes". Defendant's A1C was 5% as compared to diabetic's A1C being 6.5% or higher and prediabetes being 5.7% or higher. Defendant, luckily, does not suffer from diabetes and the Court should refrain from considering his claim of diabetes in determining extraordinary and compelling reasons for compassionate release.

Lastly, Defendant's age is outside of the typical parameters for being considered extraordinary and compelling reasons. Defendant is 45-years old. One of the extraordinary and compelling reasons expressly identified by the Policy Statement, other than health conditions, is the age of the defendant. The Sentencing Guidelines states that when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less" that the age of the defendant then may serve as an extraordinary and compelling reason. U.S.S.G. § 1B1.13, cmt. n.1(B). Defendant is not even close and any of these guidelines, so the Court should refrain from considering age an extraordinary or compelling reason.

For these reasons, Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c) and therefore the Defendant's motion should be denied.

### b. The § 3553(A) Factors Strongly Weigh Against Defendant's Release

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he merits release under the § 3553(a) factors. At the present time, it is apparent that, but for the COVID-19 pandemic, Defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution.

Should this Court determine that Defendant has met the burden of proof to show extraordinary and compelling reason, Defendant is still not entitled to relief because this Court must consider all pertinent circumstances, including the 3553(a) factors. At present, Defendant's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19. In the meantime, the disease is sadly rampant in Stark County, where Defendant says he would return to live. As of this writing, there are 1,358 residents of 370,606 diagnosed with the disease, and 120 people have died. *See*, https://www.census.gov/quickfacts/fact/table/starkcountyohio/MAN450212; *See*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards. Additionally, the virus also poses a significant threat in Clark County, NV where Defendant says he would stay with a friend in order to quarantine for 14 days after release. As of this writing, there are 2,266,715 residents of which 30,432 diagnosed with the disease, and 527 people have died. *See*, https://www.census.gov/quickfacts/clarkcountynevada; *See*, http://www.southernnevadahealthdistrict.org/covid-19-dashboard/.

This Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).The § 3553(a) factors strongly disfavor a sentence reduction for Defendant.

i.   **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

While the nature of the offense was nonviolent, the offense committed by Defendant was very serious. The circumstances of the offense speak to the characteristics of the defendant, which have been proven time and time again. From his kickback scheme while he was supposed to be

serving the State of Ohio to his efforts to evade prison by forging travel documents to fly to Pakistan all while documenting the adventure, Defendant has demonstrated that he is disinterested in accountability.

Defendant's character has to be questioned based on him having fled to Pakistan rather than surrendering himself to serve his sentence. Defendant emptied bank accounts used to support his family, left his wife and three children, travelled to Mexico, and then flew to Pakistan, all while documenting it in his diary as though it were a spy-novel. Family abandonment, forging documents, and trying to live an alternate life in a different country is representative of his character. This is just another example that Ahmad will do nearly anything to not serve the sentence for his crimes. For the reasons stated above, factor 3553(a)(1) weighs against Defendant's release.

### ii.    The Need for the Sentence Imposed

Congress instructs the court to consider "the need for the sentence imposed" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense". 18 U.S.C. 3353(a).  In *United States v. Pawlowski*, the District Court acknowledged Pawlowski's health conditions as serious and acknowledged the risks they pose should he contract COVID-19 are very serious. But the District Court also reasonably concluded that "Pawlowski's crimes were extraordinarily serious, involving abuse of a position of public trust," and that these crimes required "a significant period of incarceration." *United States v. Pawlowski*, No. 17-390-1, 2020 WL 2526523 at *7 (E.D. Pa.). Defendant's crime, like Pawlowski's, involved the abuse of a position of public interest, the seriousness of which is paramount. The need to hold individuals who use their positions of power to commit criminal actions is fundamental to our government and the trust of our citizens. At the time of writing, Defendant has only served roughly 88 months of

his 180 month sentence. By granting Defendant's motion, Defendant would be able to evade over half of his incarceration in prison. Allowing such an erasure of responsibility to occur would fail to promote respect for the law or provide just punishment for the offense. For the reasons stated above, factor 3553(a)(2) weighs against Defendant's release.

### iii. The Kinds of Sentence and the Sentencing Range Established

The Court is instructed, as a 3352(a) factor, to consider the kinds of sentence and the sentencing range established. The typical kinds of sentence and sentencing range established for such crimes are vastly more extensive than the sentence that Defendant has served at this point. The offense level computations for Defendant, as revealed by his Presentence Investigation Report, resulted in a total offense level of 44. However, any offense over 43 is to be treated as a 43 because there 43 is the highest allotted level. An offense level of 43 indicates a sentencing guideline of life in prison. Additionally, Defendant's applicable guideline landed within Zone D of the Sentencing Table, as such Defendant was not authorized to be provided with a sentence of probation pursuant to U.S.S.G. § 5C1.1(f). Defendant was then sentenced to the maximum term of imprisonment for both counts, totaling 180 months. For the reasons stated above, factor 3553(a)(3) weighs against Defendant's release.

Defendant is currently under consideration by the BOP for home confinement. That option would present a far more narrowly tailored alternative to address the potential COVID-19 threat than reducing his duly imposed criminal sentence. And if the BOP ultimately concludes that home confinement is inappropriate, that will reflect the BOP's expert judgment that it is not in the public interest to release Defendant at this time in light of Defendant's record and individual circumstances.

Accordingly, in light of Defendant's record and the totality of relevant circumstances prescribed by § 3553(a), this Court should deny Defendant's motion for a sentence reduction.

## III.    CONCLUSION

For all the reasons discussed above, Defendant's motion for release should be denied.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


*/s/ Douglas W. Squires*
DOUGLAS W. SQUIRES (OH 0073524)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Douglas.Squires @usdoj.gov

**Certificate of Service**

I certify that on July 21, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system.

☒ The CM/ECF system will send notification to the following CM/ECF participant(s):

Karl H. Schneider (kschneider@mcneeslaw.com)

☒ I also certify that I have mailed this document by United States Postal Service to the following non-CM/ECF BOP Inmate Defendant Amer Ahmad.

/s/Douglas.w.Squires
DOUGLAS W. SQUIRES (OH 0073524)
Assistant United States Attorney